10 A.3d 761

Winston ELLIOTT

v.

STATE of Maryland.

No. 24, Oct. Term, 2010.

Court of Appeals of Maryland.

Dec. 21, 2010.

Jaclyn Moyer, Assigned Public Defender (Chris Davies an Andrew Goetz, Assigned Public Defenders of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.), on brief, for petitioner/cross-respondent.

James E. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Mitchell Y. Mirviss, Michael Schatzow, Andrew Paul Kawel (of counsel), Venable LLP, Baltimore, MD, Malia N. Brink (of counsel), National Association of Criminal Defense Lawyers, Washington, D.C., for Amicus Curiae brief of National Association of Criminal Defense Lawyers.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

GREENE, J.

In this case, we are asked to determine whether the intermediate appellate court erred in applying the doctrine of inevitable discovery *sua sponte*, where the State did not argue the doctrine at any point during prior proceedings. In addition, we are asked to determine whether the Circuit Court erred in failing to grant defense counsel's motion to compel disclosure of the identity of a confidential informant where the identity of the informant was material to the issue of the defendant's guilt or innocence.

## FACTS AND PROCEDURAL BACKGROUND

On April 12, 2006, Winston Elliott was arrested in a parking lot in Prince George's County, Maryland, based on information provided by a confidential informant ("CI"). That morning, a CI, who is a registered source with the Prince George's County Police Department, contacted Detective Melvin Powell of the Narcotics Enforcement Division of the Prince George's County Police Department. Powell is the primary contact for the source within the police department. He testified that the CI previously provided information on numerous occasions

which was "accurate, [ ] proven and corroborated" and lead to the "seizure of large quantities of marijuana" in previous cases. Previously, the source had been involved in buying and selling drugs, but police agreed not to arrest him in exchange for his cooperation in future police investigations.

The CI told Powell that a man named Winston would be arriving at a movie theater near Marlow Heights later that day, in order to deliver a large quantity of marijuana. The CI described Winston as a slim, black male, approximately five feet, eight inches tall, with a heavy Jamaican accent. The CI contacted Powell a second time and told Powell that the location had changed to the Southern Marketplace shopping center, with an estimated arrival time between 1:00 p.m. and 3:00 p.m. The CI also provided the officers with a description of a black Nissan Maxima, including the license plate number, which later proved to be almost an exact match to Elliott's car.[1] The police followed the tip and set up surveillance in the parking lot. The police were accompanied by the Special Operations Division ("SOD"), also known as the SWAT team, which provides protection for undercover officers by assisting in apprehension and safe detention of suspects, as well as agents from the Drug Enforcement Administration ("DEA").

At approximately 1:20 p.m., Mr. Elliott entered the parking lot of the shopping center driving a black Nissan Maxima, accompanied by his friend, Rowan Chambers. Elliott parked his car. The two men then got out and started walking towards the shopping center. Detective Crystal Mills, the lead investigator in Elliott's case, testified that she called a K–9 unit to come to the location when the car arrived at the parking lot.[2] The officers on the scene determined that Mr. Elliott and his vehicle matched the description given by the CI, and notified the SOD to make the apprehension. An

---

1. The informant initially told police the license plate number was "3BBY2L." The license plate on Elliott's car was "3BBY21."

2. Whether the K–9 unit was actually called at this time is unclear. The issue is relevant to the determination of inevitable discovery and will be discussed infra.

unmarked SOD police van then drove toward Elliott and Chambers; four police officers jumped out of the van, identified themselves as police, and ordered the men to put their hands up. The officers pointed assault rifles and sub-machine guns at the two men as they were handcuffed and forced to the ground. The men did not attempt to flee the scene. The officers searched the men and removed all of their possessions, including car keys from Mr. Elliott's pants pocket.

Once the men were secured, SOD officer Anthony Cline called over DEA Agent Brian Silvestro, who was standing nearby. Silvestro approached the officers and requested the keys to the car. Silvestro testified that upon approaching the vehicle, he smelled the odor of marijuana emanating from the trunk. Silvestro opened the trunk using the keys, saw a large suitcase and two other bags, and smelled marijuana. He then closed the trunk. Agent Silvestro testified at the suppression hearing that the K–9 unit arrived approximately 15 minutes after he opened the trunk. When the K–9 unit arrived, Officer Andrew Logan and the police dog conducted a scan of the vehicle, and the dog alerted to the trunk area. The officers then transported the two men and the car to the Oxon Hill police station for processing. The entire sequence of events, from the initial apprehension until Elliott was placed in a police vehicle for transport to the police station, took about 30 minutes. At the police station, Agent Silvestro searched the vehicle and removed 20 pounds of marijuana contained in the suitcase, which was wrapped securely in closed, thick plastic bags. No marijuana or drug paraphernalia was uncovered anywhere else in the vehicle. No drugs or weapons were found on the two men.

Based on the evidence seized, Elliott was charged with possession of marijuana and possession with intent to distribute marijuana. Elliott filed preliminary motions in the Circuit Court for Prince George's County. He moved to suppress the drug evidence and to compel disclosure of the identity of the CI. The hearing on the motion to suppress was held on January 19, 2007, and the hearing on the motion to compel disclosure of the identity of the informant was held on Febru-

ary 16, 2007. Elliott argued at the suppression hearing that he was arrested when he was initially apprehended and ordered to the ground, and that the information from the CI was insufficient on its own to establish probable cause for a warrantless arrest. Elliott therefore moved to suppress the evidence seized from the car under the "Fruit of the Poisonous Tree" doctrine. The Circuit Court judge denied the motion after hearing testimony from four officers involved in the arrest. The sole focus at the motions hearing was whether the stop was a detention or arrest, and whether the information provided by the CI was sufficient to furnish probable cause. The court held that the initial seizure of Elliott was an investigative detention supported by reasonable suspicion, and held that the subsequent K–9 search provided the probable cause necessary to arrest Elliott and search the car.

On February 16, 2007, the Circuit Court held a hearing on the motion to compel disclosure. The parties incorporated the testimony of the suppression hearing by reference, and no additional testimony was taken. Elliott argued that the CI gave Elliott the drugs in order to set him up, and informed the court that the intended defense at trial would be entrapment. The defense attorney, however, was not permitted to question officers at the suppression hearing as to the identity of the CI. When the defense presented their theory that Elliott was set up by a specific person, the Circuit Court held that the State did not have to disclose the identity of the CI because the defense was just "fishing" and in fact knew the informant's identity. The Circuit Court denied the motion to compel, concluding that the information was not relevant to any defenses or charges, and emphasizing the obligation of the court to protect confidential sources.

Mr. Elliott's first trial was held on August 21–22, 2007. The jury was unable to reach a verdict and the court declared a mistrial. The second trial was held on April 8–9, 2008, and Elliott was found guilty on both counts. At both trials, Elliott testified in his own defense, presenting evidence to show lack of knowledge of the controlled dangerous substance, in addition to expanding on the defense's theory of entrapment.

Elliott testified that he did not know the marijuana was in the trunk of his car. Rather, an acquaintance of Elliott's, known to him only as "Christopher Lodge," was responsible for the drugs. According to Elliott, Lodge called Elliott the day before the incident, requesting that Elliott help store some of Lodge's possessions. Lodge told Elliott that Lodge had a fight with his girlfriend and that she had kicked him out of their shared apartment. Mr. Lodge asked Elliott if Elliott could help store Lodge's belongings temporarily. Elliott drove to Lodge's apartment, and Lodge placed a backpack, large suitcase, and garment bag in the trunk. Elliott testified that he did not get out of the car; he merely popped the trunk, allowing Lodge to place the items in the trunk, and Lodge then closed the trunk. The next morning, Elliott received a call from Lodge asking Elliott to meet Lodge at the shopping center, in order for Lodge to retrieve his belongings. Elliott testified that following his arrest, he believed Lodge was the CI and was unable to contact or locate Lodge. In its rebuttal, the State called Detective Powell, who testified he had never heard of Lodge. Ultimately, Elliott was convicted as a result of the second trial.

Elliott filed a timely appeal to the Court of Special Appeals. Elliott argued that the evidence of the contraband found in the trunk of the car should have been suppressed as the product of an illegal arrest and that the failure to compel disclosure of the informant's identity precluded Elliott from effectively presenting his defense at trial. The State maintained that the initial stop of Elliott was an investigative detention, not an arrest, and that the Circuit Court was correct in withholding the informant's identity. On November 3, 2009, in an unreported opinion, the Court of Special Appeals affirmed Elliott's convictions. The court held that Elliott was in fact arrested, not merely detained, when he was initially apprehended. The court concluded, however, that the evidence was nonetheless admissible under the inevitable discovery doctrine. This issue was not raised or argued by either party; rather, the court raised the issue *sua sponte*. The intermediate appellate court also held that the Circuit Court did not abuse its discretion in

refusing to compel disclosure of the confidential informant. The court reasoned that the defense did not meet its burden of showing a substantial reason why the identity was material to the defense. As a result of the court's ruling, Mr. Elliott filed a motion for reconsideration, claiming that the court erred in deciding the issue *sua sponte* because the State had never raised the issue at any point during any proceeding. The court denied the motion without opinion.

Elliott filed a petition for writ of certiorari in this Court. The Questions Presented were:

I. Did the [Court of Special Appeals] err in raising and deciding inevitable discovery *sua sponte*, where the state failed to raise it at any point during any of the proceedings?

II. Did the court err in refusing to compel disclosure of the identity of the confidential informant, where petitioner's defense was that the informant was responsible for devising the circumstances that led to his arrest?

In its answer to the petition, the State filed a conditional cross-petition, asking this Court to determine if:

The Court of Special Appeals erred in finding that the manner in which the police detained Elliott prior to the canine search of his vehicle constituted an arrest, and not an investigatory detention?

We granted both the petition and cross-petition. *Elliott v. State*, 413 Md. 228, 991 A.2d 1273 (2010).

## DISCUSSION

### I.

Regarding the denial of a motion to suppress evidence:

"[A]n appellate court looks only to the evidence that was presented at the suppression hearing. The reviewing court views the evidence in the light most favorable to the prevailing party and defers to the motions court with respect to its first level factual findings. The ultimate determination of whether there was a constitutional violation, however, is an

independent determination that is made by the appellate court alone, applying the law to the facts found in each particular case."

*Belote v. State,* 411 Md. 104, 120, 981 A.2d 1247, 1256 (2009) (internal citations omitted). Specifically, this standard applies when evaluating whether a detention becomes a de facto arrest, requiring probable cause. *See Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007).

Regarding the issue of disclosure of the identity of a confidential informant, the ultimate decision is within the discretion of the trial court. An appellate court will "look to see whether the court applied correct legal principles and, if so, whether its ruling constituted a fair exercise of its discretion." *Edwards v. State,* 350 Md. 433, 442, 713 A.2d 342, 346 (1998). In determining whether a court properly exercised its discretion, the question "is whether the court reached the right balance among the competing interests." 350 Md. at 441, 713 A.2d at 346.

We agree with the Court of Special Appeals that the detention of Elliott constituted an arrest at the time the SWAT team apprehended him, and that the police lacked probable cause to conduct a warrantless arrest. We do not agree, however, with that court's determination *sua sponte* that the evidence was properly admitted under the doctrine of inevitable discovery. Despite this conclusion, we shall affirm the Court of Special Appeals' determination that the Circuit Court's denial of the motion to suppress was proper, because the search of the vehicle was supported by probable cause.

## A. Arrest

We defined the term "arrest" in *Bouldin v. State,* 276 Md. 511, 350 A.2d 130 (1976). We stated, "it is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest . . ." 276 Md. at 515–16, 350 A.2d

at 133. Recently, in *Longshore*, we relied on *Bouldin's* definition of arrest and considered the distinction between a brief, investigative detention and a *de facto* arrest.

 In determining whether a *Terry*[3] stop is elevated to a *de facto* arrest, courts will consider many factors. "Generally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." *Longshore*, 399 Md. at 502, 924 A.2d at 1138. This Court has, however, recognized certain limited circumstances when the use of force will be considered reasonable as part of an investigative detention: where the use of force is used to protect officer safety or to prevent a suspect's flight. 399 Md. at 509, 924 A.2d at 1142. The burden is on the State to prove that such special circumstances existed in order to justify the officer's use of force in an investigative detention. *Id.* (holding that there was "no justification for placing Longshore in handcuffs" because there was no "reason to believe that [the defendant] was armed or dangerous ... [and] no reason to believe that [the defendant] was a flight risk." 399 Md. at 514, 515, 924 A.2d at 1145).

The State argued that we have approved of hard take-downs as "permissible *Terry* detentions rather than as arrests," relying on our opinion in *Cotton v. State*, 386 Md. 249, 872 A.2d 87 (2005) (holding that the defendant was not under arrest when he was handcuffed and detained for twenty minutes while police investigated the scene). The State misinterprets our limited approval of hard take-downs. In *Cotton*, we held that the temporary detention by police of persons found in or around the premises "to minimize the risk of harm to both police and occupants" did not reach the level of an

---

**3.** A *"Terry"* stop refers to a brief investigative detention which is justified when police have an articulable, reasonable suspicion that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). The *Terry* stop is "less intrusive than a formal custodial arrest," is limited in duration, and purpose and "can only last as long as it takes a police officer to confirm or dispel his suspicions." *Swift v. State*, 393 Md. 139, 150, 899 A.2d 867, 873 (2006) (internal citations omitted).

arrest. 386 Md. at 258, 872 A.2d at 92. The State, however, overlooks the fact that we sanctioned the use of force precisely because one of the special circumstances listed above was present—reasonable suspicion of danger.[4] The case does not stand for a blanket acceptance of hard take—downs absent specialized need, which was made very clear in *Longshore,* decided two years after *Cotton.*

In the present case, Elliott was arrested as he walked away from the vehicle he drove to the parking lot. Applying the *Bouldin* definition, Elliott was seized and detained by the physical touching of officers and by acts indicating an intent to take Elliott into custody. Testimony at the suppression hearing by Officer Powell revealed that the arrest was made two minutes after Elliott's car arrived at the parking lot. To confirm this, Powell later admitted at trial that "we arrested him as soon as he arrived." This was also corroborated by Agent Silvestro at trial, stating that the arrest signal was given once Mr. Elliott exited the car. These statements indicate that the police believed Mr. Elliott to be under arrest when he was initially detained. Further, Officer Cline testified at the suppression hearing that the SOD unit "drove the van towards the intended targets and we jumped out, placed them on the ground and handcuffed them." He indicated that the officers were carrying M–4's, which are short "assault rifle type [guns] for close quarters," and MP–5's, which are a type of "submachine gun." This "threatening presence of several officers, the display of a weapon by an officer, [and] some

---

4. Although we have not enunciated a specific standard for proving special circumstances, we discussed the issue in *Longshore* in the context of a reasonable *Terry* stop. We quoted *In re David S.,* 367 Md. 523, 789 A.2d 607 (2002), stating, "officers *reasonably could have suspected* that [David S.] posed a threat to their safety [when the police saw David S. place an object in his waistband]. Considering the totality of the circumstances, as they appeared to the officers at the time, in order to maintain their safety, handcuffing [David S.] and placing him on the ground for a brief time was reasonable and did not convert the investigatory stop into an arrest." *Longshore,* 399 Md. at 511, 924 A.2d at 1143 (quoting *In re David S.,* 367 Md. at 539–540, 789 A.2d at 616)(emphasis added).

physical touching of the person" would make "a reasonable person [believe] that he was not free to leave." *Swift v. State,* 393 Md. 139, 150, 899 A.2d 867, 873 (2006). Finally, as Officer Cline stated during his testimony at the suppression hearing, there was "no attempt to flee whatsoever." There was therefore no indication that Elliott posed a flight or safety risk in order to justify a hard take-down, which supports the holding that Elliott was arrested when he was initially detained.

Having found that Elliott was arrested without a warrant, we must next decide if there was probable cause to justify the arrest. We agree with the Court of Special Appeals when it held that the arrest was not supported by probable cause. "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Longshore,* 399 Md. at 501, 924 A.2d at 1137 (quotations and alterations omitted). When officer apprehension of a suspect is based on information provided by a confidential informant, reliability of the informant is "critical to any constitutional validity of the warrantless seizure" of a person. *Lee v. State,* 311 Md. 642, 653, 537 A.2d 235, 240 (1988) (applying *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In making this determination, we apply the "totality of the circumstances" test, which mandates that we look to the veracity, reliability, and basis of knowledge of the informant to establish if the CI's report furnishes probable cause. 311 Md. at 654, 537 A.2d at 240. Prior relations with the police and specificity of the tip contribute to this determination. 311 Md. at 654–55, 537 A.2d at 240.

In *Dixon v. State,* 133 Md.App. 654, 758 A.2d 1063 (2000) the Court of Special Appeals provided an in-depth analysis of our jurisprudence on the issue of confidential informants providing reasonable suspicion and probable cause. In *Dixon,* an officer received a tip from a confidential informant with whom the officer had previously worked and considered to be

"reliable and accurate." 133 Md.App. at 659, 758 A.2d at 1066. The informant told the officer that a "black man named Orville Dixon would be transporting approximately ten pounds of marijuana to [a department store parking lot] . . . at approximately 8:15 p.m. in a dark-colored Acura to conduct a drug sale." *Id.* Once police saw Dixon get into his car, several unmarked police cars blocked his vehicle in, removed Dixon from the car and handcuffed him. 133 Md.App. at 660, 758 A.2d at 1066. Police then opened Dixon's trunk without a search warrant and discovered marijuana. *Id.* Before trial, the defense filed a motion to suppress evidence, claiming Dixon was unlawfully arrested without probable cause. 133 Md.App. at 669, 758 A.2d at 1070. The State countered that the stop was an investigatory detention supported by reasonable suspicion. 133 Md.App. at 669, 758 A.2d at 1071. The Circuit Court denied the motion to suppress and the evidence was admitted.

On appeal, the Court of Special Appeals held that Dixon was arrested in the parking lot, rather than detained. 133 Md. App. at 673, 758 A.2d at 1073. Employing the totality of the circumstances test, the Court of Special Appeals also held that the informant's tip did not provide probable cause to support the arrest. The court stated:

> Probable cause in the context of an informant's tip depends on some combination of the substance of the tip and corroborative observation by law enforcement of the suspect's activities, some of which may appear innocent on its face. In the case of a confidential informant, as opposed to an anonymous one, evidence as to the informant's demonstrated reliability is also vital.

133 Md.App. at 695, 758 A.2d at 1085. The court then applied this reasoning to the case at hand and held that the tip was not sufficiently corroborated and that the informant's reliability was undeveloped. 133 Md.App. at 696, 758 A.2d at 1085.

In this case, the officers were provided with a fairly specific tip from an apparently reliable CI. Similar to *Dixon,* while the information most assuredly provided articulable,

reasonable suspicion sufficient to justify a brief investigative detention, the information was not alone sufficient to furnish probable cause to arrest Elliott on the spot.[5] The tip included a description of the suspect, containing some specific information; it also contained inaccurate and unverified statements. Specifically, the CI described the suspect or driver's height as five feet eight, and Elliott is in fact five feet eleven. Also, before arresting Elliott, police did not ask Elliott whether his name was "Winston," and did not ascertain whether he had a heavy accent, both key elements in the description that the CI gave to Powell. Instead of asking Elliott his name or asking him to speak in order to verify either piece of information, police immediately engaged in a hard-take down and handcuffed Elliott. Again similar to *Dixon*, at the time of the arrest, the police had not confirmed the claim that Elliott was engaged in any illegal activity. Rather, all the police knew at the time of arrest was that a man who was similar in description to the description provided by the CI, had parked his car and was walking toward a mall. In fact, when asked by defense counsel whether Mr. Elliott was acting "erratic or unusual," Officer Cline testified, "No. You would think he was normal [sic] shopping there." As the Court of Special Appeals noted, "[t]he only information possessed by the police at the time of the arrest was based on the CI's tip." Absent police corroboration or specific information in the tip regarding future behavior, the remaining facts, that a slim black male would be driving a black Nissan Maxima, are not sufficient to provide probable cause. Therefore, probable cause to arrest Mr. Elliott did not exist at the time of his apprehension. The Court of Special Appeals was correct in concluding that Elliott

---

**5.** *See also Lee,* where we held, "Under the totality of the circumstances of the present case at the time the police ordered the petitioners to lie prone the police had a relatively high degree of reasonable and articulable suspicion that the petitioners were the robbers and were carrying a handgun in the gym bag. But, at that time, the suspicion did not reach a level of 'probability ... of criminal activity' sufficient for probable cause." 311 Md. at 657, 537 A.2d at 242 (quoting *Illinois v. Gates,* supra, 462 U.S. at 235, 103 S.Ct. at 2330).

was arrested during his initial detention and that the arrest was not supported by probable cause.

## B. Inevitable Discovery

Despite holding that Elliott was illegally arrested without probable cause, the Court of Special Appeals nevertheless invoked the inevitable discovery doctrine, and upheld the denial of the motion to suppress the evidence seized. We hold that the intermediate appellate court erred in raising the issue *sua sponte*, because the record below was not sufficiently developed for the State to meet its burden of proving inevitable discovery by a preponderance of the evidence, and applying the doctrine would result in unfair prejudice to the defendant.

As we stated above, we are constrained to a review of the record of evidence presented at the suppression hearing in determining whether a court may review an issue *sua sponte*. *Belote v. State*, 411 Md. 104, 120, 981 A.2d 1247, 1256 (2009). We may only rely on the "facts and information contained in the record of the suppression hearing" and will defer to the hearing judge's factual findings. *Longshore*, 399 Md. at 498, 924 A.2d at 1135. This case presents the question of whether an issue may be raised and determined at the appellate level that was not raised at the suppression hearing and goes beyond the record developed. We have discussed extensively the scope of appellate review. The scope of appellate review is defined in Maryland Rule 8–131, which provides in part: "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Rule 8–131(a). "This Court has often stated that the primary purpose of Rule 8–131(a) is to ensure fairness for all parties in a case and to promote the orderly administration of law." *State v. Bell*, 334 Md. 178, 189, 638 A.2d 107, 113 (1994) (internal citations omitted). There are, however,

[W]ell-recognized exceptions to this general principle. One exception is that where the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm. In other words, a trial court's decision may be correct although for a different reason than relied on by that court.

*Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221, 1223 (1979) (citations omitted). Appellate review of issues not previously raised is therefore discretionary, but, "this discretion should be exercised only when it is clear that it will not work an unfair prejudice to the parties or the court." *Bell*, 334 Md. at 189, 638 A.2d 107 at 113.

 As stated above, there must be an adequate record below in order to justify an appellate court's departure from the general rule against raising issues *sua sponte*. In order to determine whether the present case satisfies the exception, we must determine if the record was adequate to justify the intermediate appellate court's invocation of inevitable discovery. As a preliminary matter, we have held that the usual remedy applied when police officers violate the Fourth Amendment [6] is to suppress the evidence obtained from the unlawful search or seizure, pursuant to the Fruit of the Poisonous Tree Doctrine.[7] A warrantless search is presump-

---

6. The Fourth Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

7. The Fruit of the Poisonous Tree doctrine states that "[w]hen government officials violate the dictates of the Fourth Amendment, the usual remedy is to suppress any of the resulting physical, tangible materials and verbal evidence," in order to ensure that the State does not benefit by the "exploitation of that illegality." *Myers v. State*, 395 Md. 261, 281–82, 909 A.2d 1048, 1060 (2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 485–86, 488, 83 S.Ct. 407, 416, 417, 9 L.Ed.2d 441, 453–54, 455 (1963)).

tively unreasonable, but is subject to a few, limited exceptions. *Williams v. State,* 372 Md. 386, 402, 813 A.2d 231, 241 (2002). One such exception is the doctrine of inevitable discovery, first recognized by the United States Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The doctrine is used to overcome the presumed suppression of evidence gained from an unlawful search. The State must show, by a preponderance of the evidence, that the evidence inevitably *would* have been discovered through lawful means. *See Williams,* 372 Md. at 415, 813 A.2d at 250. In determining whether the doctrine should apply, courts should "focus on historical facts capable of easy verification, not on speculation." *Williams,* 372 Md. at 418, 813 A.2d at 250.

In *Williams,* police entered a hotel room without a warrant, arrested Williams, and found cocaine in his pajamas. 372 Md. at 395, 813 A.2d at 236–37. The discovery of the evidence was then communicated to an officer standing by, and was used to furnish the necessary probable cause to obtain a warrant for the search of the premises and seizure of the evidence. 372 Md. at 396, 813 A.2d at 237. Before trial, the defendant filed a motion to suppress the cocaine seized. 372 Md. at 398, 813 A.2d at 238. The State argued that the search was justified by exigent circumstances because the police feared evidence would be destroyed. 372 Md. at 398, 813 A.2d at 239. The Circuit Court granted the motion to suppress, finding that there was insufficient information to support probable cause and that exigent circumstances did not exist. *Id.* On appeal, the Court of Special Appeals reversed, holding that the inevitable discovery doctrine applied to the evidence and the trial court erred in suppressing the evidence.

The State then argued in this Court that the evidence would have been inevitably discovered because the police were actively pursuing a search warrant and, presumably, the police would have found the evidence if they waited at the premises for the search warrant to be issued. 372 Md. at 418, 813 A.2d at 250. We rejected this argument, pointing out that the State must "demonstrate that the evidence *inevitably would have been found.*" 372 Md. at 423, 813 A.2d at 253. We

reversed the intermediate appellate court's judgment, emphasizing that "speculation will not satisfy the demands of the inevitable discovery doctrine," and holding that the record was insufficient to establish that the drugs would have been discovered during a lawful search. 372 Md. at 416, 813 A.2d at 249.

In reaching this conclusion, we discussed examples of the reluctance of other courts to apply inevitable discovery based on speculation. We cited *United States v. Boatwright*, 822 F.2d 862 (9th Cir.1987), where the government argued inevitable discovery based on police seizure of evidence pursuant to an illegal entry, and the 9th Circuit held that the doctrine was inapplicable. We stated, "[s]ome courts have been reluctant to apply the doctrine to evidence which is by its nature ephemeral or to evidence somehow dependant upon a person 'waiting patiently beside his [contraband] for an agent to arrive with a warrant.'" *Williams*, 372 Md. at 425, 813 A.2d at 254 (quoting *Boatwright*, 822 F.2d at 865). *Williams* emphasized that the "applicability of the inevitable discovery doctrine is a highly fact-based determination and involves review by the *trial* court whether the evidence in question would have been found." 372 Md. at 424, 813 A.2d at 254 (emphasis added). We noted that the inevitable discovery of the cocaine was "never raised or argued at the suppression hearing." *Id.* The emphasis on fact finding and the duty of the trial court is instructive, and demonstrates the limitation on the ability of an appellate court to decide a factual issue. A reasonable interpretation of *Williams* suggests that absent evidence relating to inevitable discovery, the doctrine should not be applied *sua sponte* because an appellate court's determination of the issue would be based on speculation rather than "historical facts that can be verified or impeached." *Id.*

*Stokes v. State* is also instructive. 289 Md. 155, 423 A.2d 552 (1980). In *Stokes*, we emphasized the importance of determining what *would* have happened absent the illegal activity. We stated:

Jurisdictions which recognize the doctrine caution that courts may not, under the guise of inevitable discovery,

admit tainted evidence after launching a speculative inquiry into what might or could have occurred. . . . *The significance of the word 'would' cannot be overemphasized.* It is not enough to show that evidence 'might' or 'could' have been otherwise obtained.

289 Md. at 164, 423 A.2d at 556–57 (internal citations omitted) (emphasis added). In *Stokes,* evidence was obtained pursuant to an involuntary statement. 289 Md. at 162, 423 A.2d at 556. The State argued that, even if the statement was involuntary, the evidence would have been inevitably discovered by police conducting a lawful search. *Id.* We were not persuaded. We said:

The State has failed to meet even the most minimal requirements of [the inevitable discovery] doctrine. Although the prosecution, seeking to invoke inevitable discovery, bears the burden of establishing the admissibility of otherwise tainted evidence, the *state's attorney here made no effort in the trial court to demonstrate compliance* with either prerequisite to admissibility under this exception to the exclusionary rule. It is true that the State avows in this Court that the police, absent Stokes' statement, 'would' have searched the ceiling above petitioner's bedroom. This unsupported assertion, however, is no substitute for evidentiary proof. *The prosecution produced no evidence tending to show that a predictable police procedure* existed for inspection of the room which would have resulted in the discovery of the illegal narcotics. It is now on appeal too late to speculate about what procedures the police utilize . . . [and] to further speculate whether following those prescribed procedures would have revealed the location of the drugs.

289 Md. at 165–66, 423 A.2d at 557–58 (emphasis added). Although the State, in *Stokes,* argued inevitable discovery on appeal, it could not meet the burden of proving the exception because no evidence was produced at the suppression hearing to support the exception, and correspondingly no evidence for this Court to review. 289 Md. at 166, 423 A.2d at 558.

In addition to determining whether the record is adequate to support a finding of inevitable discovery, appellate courts must evaluate if the state's failure to raise an issue at the trial stage unfairly prejudiced the defendant's case. *State v. Bell,* 334 Md. at 188, 638 A.2d at 112. One recognized form of prejudice results when the State's failure to raise an issue prevents the defendant from rebutting a claim or adducing evidence necessary to form defenses. This works in conjunction with the need to prove the adequacy of the record because, "[i]f a party's presentation of his or her case was prejudiced by an opponent's failure to raise an issue at the trial stage [or other proceeding] (i.e., the party did not adduce the requisite evidence), then the record is necessarily lacking and will not be 'adequate' to support the alternative ground raised on appeal." 334 Md. at 188, 638 A.2d at 112–13.

In *State v. Bell,* police stopped a suspect standing near a car and observed a vial of white powder lying on the floor of the passenger seat. 334 Md. at 181, 638 A.2d at 109. Under the authority of the *Carroll* doctrine,[8] the police retrieved the vial. 334 Md. at 182, 638 A.2d at 109. Subsequently, the police began an inventory search, expecting the vehicle would be towed when other officers arrived on the scene. *Id.* In response to the defendant's motion to suppress, the State argued there were two distinct searches, each justified by different exceptions, a *Carroll* search and an inventory search. 334 Md. at 182–83, 638 A.2d at 112. While the Court of Special Appeals upheld the *Carroll* exception as to the first search, it held the inventory search was invalid. 334 Md. at 184, 638 A.2d at 110.

On appeal, the State changed its argument, attempting to merge the searches and justify both under *Carroll. Id.* This Court rejected the State's ability to change the structure of its

---

**8.** The *Carroll* doctrine refers to a Supreme Court case, which held that police may search a vehicle if there is probable cause to believe a stopped vehicle contains "a crime-connected item within the car" based on the exigency of the mobility of the vehicle. *State v. Wallace,* 372 Md. 137, 146, 812 A.2d 291, 296 (2002) (applying *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

argument for the first time on appeal. 334 Md. at 191, 638 A.2d at 114. The Court explained, "[b]y structuring its argument in such a way, the State dissuaded Bell from offering evidence on the matters of probable cause for the second search and exigency of the circumstances." *Id.* This resulted in unfair prejudice because the defendant, "cannot be expected to rebut possible justifications for the search on his own initiative. The State may not lead the defendant and the trial court down a primrose path, only to leave them stranded when, on appeal, the State deems it advantageous to its strategy." *Id.* In reaching this conclusion, we were persuaded by a United States Supreme Court case dealing with the same issue, *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), in which the Supreme Court stated:

> To permit the Government to inject its new theory into the case at this stage would unfairly deprive the petitioner of an adequate opportunity to respond. This is so because in the District Court petitioner, being entitled to assume that the warrant constituted the only purported justification for the arrest, had no reason to ... adduce evidence of his own to rebut the contentions that the government makes here for the first time.

357 U.S. at 488, 78 S.Ct. at 1251, 2 L.Ed.2d at 1510–1511 (1958); *See also Bell,* 334 Md. at 189–90, 638 A.2d at 113, ("[a] criminal defendant could suffer unfair prejudice if, for example, the defendant's response to a new argument posited by the State on appeal depends on evidence which was not offered in the trial court.").

Although appellate courts have some discretion in raising different justifications for lower court decisions, we may not use such discretion without restriction. In the present case, the record does not support a *sua sponte* holding of inevitable discovery. We are bound by the evidence presented at the suppression hearing. Unfortunately, in this case the record is not complete and cannot support a *sua sponte* finding of inevitable discovery. Even assuming *arguendo* that the evidence would inevitably have been discovered, the defense was

unfairly prejudiced by the issue being raised for the first time in the appellate court. Further, any decision by the appellate court must be based on historical facts capable of easy verification, rather than speculation, which cannot be done in this case. *See Williams*, 372 Md. at 418, 813 A.2d at 250.

Regarding the issue of inevitable discovery, we are bound by the facts in the record before us. The timing of the call to the K–9 unit is integral in determining whether the evidence would have been inevitably discovered absent the illegality. The exact timing of the apprehension and the call to the K–9 unit, however, is unclear from the record. While Officer Mills testified that she called the K–9 unit before Elliott's apprehension, Agent Silvestro indicated that he opened the trunk of the car, smelled marijuana, and then closed the trunk to wait for the K–9 unit. This is consistent with the notion that the police waited until Silvestro smelled the marijuana and then called the K–9 unit. Apparently, the suppression hearing judge thought this was the case, stating in his summation of the evidence presented at the suppression hearing that, "[t]he investigation included the sniff or the smell of the marijuana by DEA Agent Silvestro and then they called the drug dog." The distinction is key to the determination of whether the record was sufficient to support a *sua sponte* application of the inevitable discovery doctrine. Despite the importance of this information to the issue on appeal, the issue of timing was not argued at the suppression hearing because it was not relevant to the issue of probable cause or the classification of the stop as a detention versus an arrest. The defense, therefore, had no impetus to challenge the apparent discrepancy or to further question officers as to the precise timing of the call to the K–9 unit. Furthermore, this case is like *Williams*, regarding the lack of clarity in the record.

In *Williams*, the police could have waited for the pending search warrant to be processed before making the arrest, rather than preemptively arresting Williams and searching him without a warrant. Here, police could have waited for the

K–9 unit to arrive in order to obtain probable cause to arrest Elliott and search the vehicle. They knew in advance, based upon the informant's tip, that contraband would be in the trunk of the vehicle and the approximate time of arrival. Moreover, we do not know why the K–9 unit was not in the immediate vicinity of the stop when it occurred. Assuming the evidence here would have been discovered because the K–9 unit was already on it's way is "a speculative inquiry into what might or could have occurred." We do not know how long Elliott intended to be at that location or where he was headed before he parked the car, was arrested, and had his keys taken from him by the police. It appears from the officers' suppression hearing testimony that the police were able to approach the car and conduct a K–9 search as a direct result of the illegal arrest. Accordingly, consistent with *Boatwright*, we cannot assume that Elliot would have "waited patiently beside his [alleged] contraband" until the K–9 unit arrived.

■ Further, the State should not be permitted to benefit from the appellate court's raising of an issue that the State did not raise at the suppression hearing pursuant to a failed "trial strategy[,]" or oversight. The State's position at the suppression hearing was that the detention of Elliott was lawful, and that the subsequent alert on the vehicle by the dog provided the probable cause necessary to arrest. Taking that legal position, which was legally incorrect, and failing to argue an alternate theory to justify the admission of evidence seized, was, therefore, subject to risks. The State refused to concede any illegality in the detention. This strategic election, or oversight, was made to the State's detriment, as we have determined based on our review of the record that Elliott's apprehension constituted an arrest. As in *Williams*, where the State elects to argue one exception to the warrant requirement over another because the exceptions are contradictory or may undermine each other, the failure to preserve the issue for appellate review in this case by raising inevitable discovery or having it decided in the trial court cannot be remedied after the fact. Similar to *Bell*, the State may not now benefit from

a failed trial strategy or oversight which unfairly prejudices the defense's ability to rebut evidence on appeal. Instead, we "merely accept[ ] the State's presentation of the case."

Finally, the defense was unfairly prejudiced in this case because counsel did not have the opportunity to rebut the application of the inevitable discovery doctrine at the suppression hearing, as the State did not raise the issue. As in *Bell*, the defense was effectively dissuaded from offering evidence regarding inevitable discovery, because the State did not raise the issue and only argued the legality of the arrest. The defense cannot, and should not be expected to rebut all possible justifications for an illegal search in the event that a search or arrest is later found invalid on appeal. Similar to *Stokes*, there was no testimony as to police procedure and what the police actually *would* have done absent the illegal arrest. Specifically, we do not know whether it is typical police procedure, in a case involving information furnished by a confidential informant, to call a K–9 unit as soon as a suspect is spotted, or to wait until after the suspicion of drugs is verified. In this case, either method is plausible, but the record is not clear as to the underlying historical facts. Our prior reluctance to apply inevitable discovery absent a clear factual record, combined with the failure of the State to raise the issue below and the resulting unfair prejudice to the defense, precludes this Court and the intermediate appellate court from relying on the doctrine *sua sponte*.

Notwithstanding our holding that the Court of Special Appeals erred in raising the issue of inevitable discovery *sua sponte*, we nonetheless affirm the intermediate appellate court in upholding the denial of the motion to suppress. It is important to note that the standard for reviewing a denial of a motion to suppress is different than the standard used in reviewing whether an appellate court properly raised an issue *sua sponte*. When reviewing a denial of the motion to suppress, "we make our own independent constitutional appraisal" and we must consider the facts in the light "most favorable to the State as the prevailing party on the motion." *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990). In the

present case, the suppression hearing judge determined that the police officers conducted an investigation and "after the smell of both the DEA Agent Silvestro and the smell of the K–9 dog, [the police] had probable cause to do the search." We agree with this determination for two reasons. First, from the beginning of the investigation, the police officers focused primarily on the vehicle. Second, in reviewing the evidence in the light most favorable to the State, the police called for the K–9 unit before Elliott was apprehended, and thus, "the premature arrest of the appellant was not [necessarily] causally related to the discovery of the marijuana and the motion to suppress properly was denied."

## II.

The Court of Special Appeals erred in affirming the Circuit Court's denial of the motion to compel disclosure of the identity of the confidential informant. In reviewing a trial court's determination not to compel disclosure, "we look to see whether the court applied correct legal principles and, if so, whether its ruling constituted a fair exercise of its discretion." *Edwards v. State*, 350 Md. 433, 442, 713 A.2d 342, 346 (1998). This standard applies in determining "whether the State's privilege accedes to the defendant's constitutional rights of due process and confrontation." *Brooks v. State*, 320 Md. 516, 523, 578 A.2d 783, 786 (1990). The burden is on the defendant to show a "substantial reason indicating that the identity of the informer is material to his defense or the fair determination of the case." 320 Md. at 528 n. 3, 578 A.2d at 789 n. 3 (relying on *Drouin v. State*, 222 Md. 271, 286, 160 A.2d 85, 93 (1960)).

Maryland has long recognized the privilege of the State to protect the identity of informants. *Brooks*, 320 Md. at 522, 578 A.2d at 786. There are, however, certain limitations on the State's privilege to withhold the identity. First, "[w]hile the State's interest in maintaining the anonymity of its informers is manifestly important, that interest is necessarily circumscribed by the defendant's interest in a fair trial."

*Id.* Thus, in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court limited the privilege of nondisclosure based on principles of "fundamental requirements of fairness." The Court stated, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60, 77 S.Ct. at 628, 1 L.Ed.2d at 645. Second, the privilege is limited to its underlying purpose: "once the identity of the informer has been disclosed to those who would resent the communication, the privilege no longer applies." *Brooks,* 320 Md. at 523, 578 A.2d at 786–87.

When evaluating whether the privilege applies, we have stated that "the key element is the materiality of the informer's testimony to the determination of the accused's guilt or innocence." *Warrick v. State,* 326 Md. 696, 701, 607 A.2d 24, 27 (1992). In undertaking this analysis, *Roviaro* established that judges must perform a balancing test, weighing "the public interest in protecting the flow of information against the individual's right to prepare his defense." 353 U.S. at 62, 77 S.Ct. at 628, 1 L.Ed.2d at 646. The balance will depend on the circumstances, and a court should take "into consideration the crime charged, the possible defenses, [and] the possible significance of the informer's testimony." 353 U.S. at 62, 77 S.Ct. at 629, 1 L.Ed.2d at 646. Further, the "right to produce one's only defense must predominate over protecting the State's flow of information—as important as that purpose may be." *Hardiman v. State,* 50 Md.App. 98, 109, 436 A.2d 923, 929 (1981) (holding that the trial court abused its discretion in not compelling the disclosure of the identity of the confidential informant, where the state's evidence consisted solely of the testimony of one undercover officer based on information from a CI). We have previously identified three defenses which often require disclosure: entrapment, lack of knowledge, and mistaken identity. *Brooks,* 320 Md. at 523, 578 A.2d at 787.

 Further, in cases where the materiality of the informant's identity arises in the context of an alleged Fourth Amendment violation, this Court and the United States Supreme Court have emphasized the importance of ensuring a fair determination of probable cause. *See Edwards,* 350 Md. at 446, 713 A.2d at 348. Specifically, in a case involving a warrantless search based on information provided by a CI, "the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication [to establish probable cause]." *Roviaro,* 353 U.S. at 61, 77 S.Ct. at 628, 1 L.Ed.2d at 645. The trial judge has discretion to determine whether disclosure is warranted, by taking into account whether probable cause is a significant issue in the case. *Edwards,* 350 Md. at 445, 713 A.2d at 348. As this Court stated in *Edwards,* " '[i]f the accused asserts any substantial ground indicating that the identity of the informer is material to his defense *or the fair determination of the case on the issue of probable cause,* the trial court should require the informant's name to be given (or the evidence suppressed).' " 350 Md. at 446, 713 A.2d at 348 (quoting *Drouin v. State,* 222 Md. 271, 286, 160 A.2d 85, 92–93 (1960)). Finally, in cases where the record is insufficient for the court to perform a balancing test, we have recommended that the proper course should be for the court to hold an *in camera* hearing, enabling the judge to speak with the informant and determine his or her role in the matter. This allows the court to make "an informed judgment as to whether the informant's identity should be disclosed." 350 Md. at 446–47, 713 A.2d at 348.

 In this case, the Circuit Court and the Court of Special Appeals did not apply the correct legal principles. The facts compelled a limit on the State's privilege based on fundamental fairness, because disclosure was both relevant and helpful. The Circuit Court judge stated, "the [c]ourt does have an obligation, ... to make sure that these confidential sources are protected, and I'm going to see—I'm going to do everything that I can to make sure that they are protected."

The motions court therefore did not perform a balancing test but rather merely invoked and applied the State's privilege.

Further, had the court applied the *Roviaro* balancing test, Elliott's right to prepare his defense would outweigh the public interest in protecting the flow of information. In performing the balancing test, the motions judge should have taken into account the crime charged and the possible defenses. Contrary to the Court of Special Appeals's holding, the defendant satisfied his burden of showing a substantial reason why disclosure was material. The defense stated, "our argument [is] that the confidential informant was part and parcel of the transaction," and further, "we think he's a material witness." The identity of the CI was material because it was relevant to the charges as well as the defenses raised. Regarding the charges, possession and possession with intent to distribute both require the State to prove the defendant's knowledge of such possession. This element proved to be extremely relevant and was obviously a concern for the jury, because in both trials, jurors sent notes to the court asking if they could convict Elliott if he did not know the marijuana was in his trunk. Therefore, the CI's identity was material to Elliott's case as it offered to negate the knowledge element of the charges. Additionally, both defenses raised by Elliott at trial, lack of knowledge and entrapment, were identified in *Brooks* as defenses which will ordinarily require the disclosure of the informant's identity.

The information provided by the CI in this case was also integral in establishing the alleged probable cause to stop and search Elliott's vehicle. According to Elliott's entrapment defense, the CI was a material participant in the exchange, as the CI arranged it by delivering the suitcase to Elliott. The CI was the only source of information connecting Elliott with the drugs; there were no drugs on his person or in the passenger compartment of the car, and no drug paraphernalia or distribution paraphernalia were found. Similar to *Edwards,* the case against Mr. Elliott was based on the evidence seized from the vehicle and the admissibility of that evidence "depended almost entirely on the credibility of the unnamed

informant" who provided the information about the drugs to the police. 350 Md. at 447, 713 A.2d at 349. Under *Roviaro,* the State was required to disclose the identity because there was "[in]sufficient evidence apart from his confidential communication" to establish probable cause. Therefore, Elliott was denied a fair determination on the issue.

Finally, the fact that Elliott claimed knowledge of the identity of the CI, in asserting that the CI was Lodge, does not protect the State from disclosing the identity. Rather, as stated in *Brooks,* such knowledge, if true, would destroy the privilege. Elliott, however, was never allowed to determine if his assumption was correct. The Court of Special Appeals held that Elliott undermined his own argument in requesting the disclosure, because his argument implied he knew the CI was Lodge. The intermediate appellate court, however, held that Elliott did not in fact know the identity of the informant and therefore the privilege was not destroyed. Were it to stand, the holding of the Court of Special Appeals would completely undermine a defendant's ability to assert a defense. Elliott believed he knew who the CI was, but was not sure. He was not permitted to question officers or obtain information. Instead, the motions judge told Elliott he could subpoena the person he believed was the CI. This results in circular logic. The motions court denied Elliott's motion because the court believed Elliott knew the identity, but denied him ability to determine if his assumptions were correct. The court then held his assumed knowledge against him in refusing to vitiate the privilege. If Elliott was wrong in assuming the identity of the CI, then he could have altered his trial strategy accordingly, rather than being forced to argue both entrapment and lack of knowledge without being permitted to argue identity of the informant to the jury. If Elliott was correct, the privilege would have been vitiated. Either way, Elliott needed police confirmation to establish his defense and was unfairly prejudiced in not being able to do so. We therefore reverse the Court of Special Appeals's holding that the Circuit Court properly denied the motion to disclose the identity of the confidential informant.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.

Judge ADKINS joins in the judgment only.

