51 A.3d 597

**David REID**

v.

**STATE of Maryland.**

**No. 113, Sept. Term, 2011.**

Court of Appeals of Maryland.

Aug. 24, 2012.

Bradford C. Peabody, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, and Howard R. Ehrlich, Rule 16 Atty., Baltimore, MD), on brief, for appellant.

Brian S. Kleinbord, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Todd W. Hesel, Honors Attorney, Baltimore, MD), on brief, for appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

This case presents us with questions regarding the use of certain technology about which we have not had occasion to opine before, in the context of the Fourth Amendment.[1] The primary issue before us is whether the use by Baltimore City police of a Taser[2] that fired two metal darts into the back of David Reid, the Appellant, affected a *Terry*[3] stop or his

---

1. The Fourth Amendment to the United States Constitution states:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

2. At oral argument, the Assistant Attorney General explained that a Taser can be used in either of two fashions: an officer may make contact directly with a suspect with the Taser, which will discharge electricity without expelling any darts from the device or the officer may use the Taser in what was described as dart mode, in which the metal darts are expelled from the Taser and penetrate the skin before discharging electricity. The Taser in this case was used in dart mode, so our inquiry is limited to that usage.

3. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)

arrest.[4] The determination of the type of detention is pivotal, affecting whether a statement Reid made to the police that he had a gun in his pocket, and the gun itself, should have been suppressed by the Circuit Court Judge who denied Reid's Motion to Suppress.

After having been convicted on an agreed-upon statement of the facts of wearing, carrying, or transporting a handgun illegally and of being in possession of a handgun after conviction of a disqualifying offense, Reid appealed to the Court of Special Appeals, but, before any action was taken in that court, we, on our own motion, granted certiorari, 424 Md. 628, 37 A.3d 317 (2012), to consider the following questions:

> 1) Should the trial court have suppressed the evidence seized, where the use of a "Taser" to effectuate a *Terry* stop, under the circumstances of this case, violated the Fourth Amendment?
>
> 2) Did the trial court err in denying Appellant's motion to suppress his statement made following arrest and prior to *Miranda* warnings? [5]

The State, in its brief, presented the questions as:

> 1) Was the Fourth Amendment seizure of Appellant supported by probable cause, and therefore reasonable, regardless of whether it was a de facto arrest or investigatory detention?
>
> 2) Was Appellant's statement that he had a gun in his pocket properly admitted under the "public safety" excep-

---

**4.** The dissent, in a leap of appellate fact finding, discusses the characteristics of a Taser model, although any specifics were not part of the record in the case. Most importantly, the dissent disregards, in the entirety, the particulars of the force involved when the darts penetrated Reid's back and does not even mention that the darts remained connected to Reid's back, through wires, to the officer holding the Taser weapon, such that Reid was leashed to the officer. Furthermore, the dissent disregards the distinction in this case from *United States v. Colon*, 654 F.Supp.2d 326 (E.D.Pa.2009), which involved a defendant reaching into his waistband for a gun, which Reid did not do.

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tion to *Miranda,* and even if the statement should have been suppressed, was the gun found in Appellant's pocket nonetheless properly admitted, thus making the admission of the statement harmless error?

We shall hold that the use of a Taser to fire two metal darts into Reid's back converted what otherwise may have been a *Terry* stop into a *de facto* arrest for Fourth Amendment purposes, and that there did not exist sufficient probable cause to arrest Reid. We shall further hold that both Reid's statement and the gun recovered from him should have been suppressed.

When the issue was addressed in the suppression hearing, Detective Scott Reid, unrelated to David Reid, was the only individual who testified. The Circuit Court Judge determined that the Detective was credible and made the following findings:

With respect to the facts leading up to the encounter between Reid and police officers, the judge found that officers received a call from an informant who told them that a tall, black male was armed and selling drugs at a particular location in Baltimore City:

Detective Reid, he was credible, he provided evidence, he was a relatively experienced officer, showed that he received a call or information from another, a superior, a Lieutenant McVicker about a confidential informant and provided information, and as counsel noted, I don't think this is particularly significant. I mean, it was a confidential informant so it was someone that they actually were aware of and it provided certain information but it wasn't particularly that significant information in the sense that it wasn't predicting any sort of future activity on the targets but nonetheless did provide information and in fact there was an individual, a taller individual, who he associated with a black Honda in a particular location.

The judge went on to find that the officers arrived at the location and observed a group of men, including a taller man, near a black Honda:

The officers responded at that location, I believe it was about 12:30 during the day in a public street and saw an individual sort of, Mr. Reid was described to be the taller individual, I guess among the three or four individuals that were present near this black Honda, he was the taller of the individuals and the officers then went to respond, and the call was for drugs, someone associated with drugs and/or guns in this vehicle.

The judge then found that the officers were wearing their badges and guns, thereby giving Reid notice that they were police and that Reid moved to conceal the right side of his body from one officer before running, as the officers approached:

[the officers] were wearing indicia of being police, meaning badges and they had their badges hanging down and I believe a gun, the defendant was observed, at that particular point in time, to try to enter the black Honda which I guess, again, would corroborate the fact that he was somehow associated with the Honda. He also, as the officers came, the officers indicated or the officer, Detective Reid, indicated that he made some sort of actions to secrete himself or what he called blading which I, for the record, is sort of turning yourself away from the police officers so they couldn't see the side where in fact the gun would be, checking the area where the gun would be, and then, as the officers approached, at that time, the defendant ran.

The judge also found that the officers called out to Reid to stop, and, when he did not, the Detective fired two metal darts from his Taser at Reid. The judge, relying on a case from the United States District Court for the Eastern District of Pennsylvania, then determined that the Detective effected a proper *Terry* stop by shooting the darts into Reid:

The officers at that particular point in time attempted to stop the defendant by calling out to him and I would find at that particular point in time, based on of all those observations, the confidential informant information which is corroborated by what the officers saw, by the fact that he made sort of evasive maneuvers when the officers came, and then

obviously the flight when the officers came up, he ran. And then while he was running away, he had gym shorts on and in the gym shorts there was a heavy object which made sort of a swinging motion which would again be consistent with having a handgun or something similar to a handgun in his pocket.

So at that point in time, I find that the officers had articulable suspicion both to stop and to frisk the defendant. The defendant did not respond when the officers identified themselves and asked him to stop. At that time he was struck with a Taser. It seems to me the case law is very consistent, I mean, obviously when the officers have articulable suspicion to stop someone, they can in fact use reasonable force to effectuate the stop which could include tackling him, handcuffing him, and I was able to find at least one case, there was a federal case, in the United States District Court for the Eastern District of Pennsylvania which is *United States v. Colon*, 654 F.Supp.2d 326 (E.D.Pa.2011 [2009]), in which the Court found that in fact it was reasonable and appropriate to use a Taser to in fact stop the defendant when, one, he was believed to be armed, and, two, he was responding to what the officers asked—when the officers asked him to stop and he was in a public street at that time, a public location I should say.

The judge went on to consider whether or not *Miranda* warnings should have been given to Reid because of his determination that a reasonable person in Reid's position would have believed he was in custody and "not free to go":

It seems to me at some point in time, a stop can get to the point where someone is in custody and certainly it seems to me under the facts of this circumstance where in fact this gentleman was knocked down, he had two prongs in his back from where he had been struck by the Taser and as the Detective indicated, in fact it would take a medical technician or a medical personnel to actually remove the Taser, I would find that in fact under those circumstances, a reasonable person would believe that they were in custody and not free to go.

The judge concluded, however, that the public safety exception [6] to *Miranda* applied and denied suppression of Reid's statement and the gun itself, but declined to rule on the issue of inevitable discovery:

> At this particular point in time what the evidence shows though is in fact the simple question was, I think the Detective asked him if he had anything illegal on him, and this was in the context of just having taken this person down, having articulable suspicion to believe that he was armed, I would find that in fact this would qualify under the safety, public safety exception that was set out in *New York v. Quarles* which is 467 U.S. 49 [649, 104 S.Ct. 2626] and then there were similar cases in Maryland, specifically— well, not exactly a similar case but talked—discussed about the public safety section which is *Thomas v. State*, which is 128 Md.App. 274 [737 A.2d 622] and there is also, I believe, was the case of *Hamilton v. State* which is another public safety exception which was 62 Md.App. 603 [490 A.2d 763].
>
> I think under the circumstances that these particular officers were not asking that question for some sort of investigatory term, certainly I would find at that point in time, they would have had a right to frisk him, I think it was clearly just to ask for a public safety, safety of the officers, just quickly trying to get down to the reason why they. stopped him and they asked that and at that time, the defendant did respond that he had a gun in his pocket, and the officers then searched his pocket. And again, I don't know if I have to go there, I don't really find the record would not—at this particular point would be sufficient that there would be in a sense inevitable discovery but I think that is irrelevant at this point. I find there was a public safety exception, therefore the statement was—the response

---

**6.** The public safety exception to the *Miranda* requirement was articulated by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), in which the Court held that there is a narrow exception to the rule that *Miranda* warnings must be given to a suspect in custody before interrogation may begin in instances in which there exists a threat to public safety.

to the statement would be admissible and therefore the recovery of the gun would be admissible.

In essence, the judge determined that the Detective attempted to initiate a *Terry* stop by yelling at Reid to stop, but that the stop was converted into a custodial interrogation after the two metal darts had been deployed and hit their mark, but that the public safety exception "saved" the statement given by Reid prior to having been *Mirandized* and the gun from suppression.

Our consideration is the same as that of the trial judge, based on his findings at the suppression hearing, more particularly, whether penetration by the two metal darts from the Taser effected an arrest, requiring probable cause, or an investigatory stop, based upon only reasonable, articulable suspicion, under the Fourth Amendment to the United States Constitution.

In its landmark decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court interpreted the Fourth Amendment to permit a law enforcement officer to stop an individual that the officer suspected may have been involved in criminal activity. The Court held if an officer has reasonable, articulable suspicion that the suspect was armed, the officer could frisk the individual for weapons. *Id.* at 24, 88 S.Ct. at 1881, 20 L.Ed.2d at 907–908. The Court noted, however, that this exception to the requirement that an officer have probable cause before conducting a search was narrowly drawn and limited to frisking only the individual's clothing for weapons. *Id.* at 29–30, 88 S.Ct. at 1884–85, 20 L.Ed.2d at 911.

The State asserts that what occurred in the present case was a *Terry* stop, because it analogizes deployment of the two metal darts into Reid's back to a "hard take down" that we determined was a *Terry* stop in *In re David S.,* 367 Md. 523, 789 A.2d 607 (2002). In *In re David S.,* we considered whether ordering David S. and Hall, a man with him, to the ground at gunpoint, "put[ing] them on the ground," and handcuffing them constituted a proper *Terry* stop. In that

case, officers were conducting a stakeout of a house they believed to be an open air drug market, when they observed Hall engage in what they believed to be a drug transaction. Before being able to apprehend him, however, Hall entered the house. Approximately half an hour later and after changing their stakeout location, the officers observed Hall walking with David S. down a different street and stop at an abandoned house. David S. went behind the house, returned, and showed Hall something in his waistband. The officers believed David S. had obtained a handgun and moved in "with their weapons drawn, forced [David S.] to the ground and placed him in handcuffs." *Id.* at 539, 789 A.2d at 616. After Hall and David S. were placed in handcuffs, the officers frisked David S. and found a hard, wrapped object in his waistband that, once unwrapped, was determined to be cocaine.

Before analyzing the particulars of David S.'s detention to determine if it was a proper *Terry* stop, we noted that "it is important to recognize that there are no *per se* rules or bright lines to determine when an investigatory stop and frisk becomes an arrest." *Id.* at 534, 789 A.2d at 613. We also reiterated the principle that the use of drawn weapons or handcuffs does not *per se* convert a *Terry* stop into an arrest, so long as those tactics are reasonable measures designed to ensure officer safety. After considering the totality of the circumstances surrounding David S.'s detention, we determined that the officers had reasonable, articulable suspicion that David S. and Hall had committed or were about to commit a crime. Relying in part on the approval of "hard take downs" in *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), we held that even though the intrusion onto David S.'s Fourth Amendment rights was substantial, it was reasonable because of the threat to officer safety, and thus the detention was a proper *Terry* stop.

In *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988), we considered circumstances in which officers had received a tip that two men who were playing basketball on a public court

were in possession of a weapon used in a robbery. When the officers arrived at the courts, they maintained contact with the person who gave them the tip, who told them the gun was in a bag hanging on the fence. After spotting Lee coming out of a nearby house with a blue bag, the officers moved in with shotguns drawn and ordered everyone, including Lee, to lie down on the ground. A subsequent search of the bag revealed the weapon.

In reviewing the denial of Lee's Motion to Suppress, we stated that the officer's order to Lee to lie down, made with guns drawn, did not elevate the stop to an arrest. We noted that the level of intrusion onto Lee's person was minimal as he was only ordered to lie down and was never physically touched by the officers until the gun was recovered. We considered the following circumstances to be relevant to our determination: that the tip provided information that Lee was armed, that the officers were exposed to considerable danger of being shot, that by ordering everyone to the ground the officers decreased the likelihood of danger to bystanders, and that the detention only lasted two minutes. We then concluded that the use of force was reasonable under the circumstances, relying, in part, on *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), in which the Supreme Court expressly approved threatening a suspect with force, in that case deadly force, when performing a *Terry* stop involving a suspect the officer reasonably believed to be armed and dangerous.

■ While at the heart of the State's argument are our decisions in *In re David S.* and *Lee,* both *Terry* stop cases, Reid argues, conversely, that having two metal darts penetrate his body, such that medical assistance was needed to remove them, effected a *de facto* arrest. To put *de facto* arrest in context, it is important to recognize that, while a formal arrest occurs when an officer informs the suspect that he or she is under arrest, a *de facto* arrest occurs when the circumstances surrounding a detention are such that a reason-

able person would not feel free to leave.[7] In *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), the Supreme Court considered whether Dunaway's seizure constituted a *de facto* arrest under the Fourth Amendment and concluded that he was under arrest, because Dunaway believed he was not free to go based on the facts that he was taken to the police station in a squad car, was not told he was free to leave, and would have been physically restrained were he to have attempted to leave. *Id.* at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 835–36. In *Owens v. State*, 399 Md. 388, 924 A.2d 1072 (2007), we reiterated this standard for a *de facto* arrest, when we opined that "a person is considered in custody when a reasonable person [would] have felt he or she was not free" to end the encounter and leave. *Id.* at 428, 924 A.2d at 1095 (internal quotations omitted).

We recently had occasion to again address the issue of what constitutes a *de facto* arrest in *Bailey v. State*, 412 Md. 349, 987 A.2d 72 (2010). In *Bailey*, police officers were patrolling at night in Prince George's County and saw Bailey standing in the shadows near a house. After calling out to Bailey and not hearing a response, the officers got out of their car and approached him. When they neared Bailey, the officers detected a strong scent of ether and immediately grabbed him, put his hands over his head, and searched him, recovering a glass vial filled with PCP. Before us, Bailey argued that his seizure under these circumstances was a *de facto* arrest.

We agreed and concluded that the officer's actions elevated Bailey's detention to a *de facto* arrest, because the officer "acted with actual authority and physically seized the petitioner, and the petitioner had a clear understanding that he was

---

7. The trial judge apparently believed that once the Taser darts hit Reid in the back, Reid believed he was not free to go and, thus, was under a *de facto* arrest:

> he had two prongs in his back from where he had been struck by the Taser and as the Detective indicated, in fact it would take a medical technician or a medical personnel to actually remove the Taser, I would find that in fact under those circumstances, a reasonable person would believe that they were in custody and not free to go.

not free to leave." *Id.* at 373, 987 A.2d at 87. In reaching our conclusion, we relied in part on our decision in *Grier v. State,* 351 Md. 241, 718 A.2d 211 (1998), in which we stated, in the context of determining whether Grier's post-arrest silence could be used against him at trial, that being subjected to an officer's "custody and control" constituted an arrest:

> [a]fter Grier came out of the dead-end alley, the officers immediately arrested him. The officers pursued Grier, "got" him, and put him on the ground. Once [Grier] was on the ground and in the custody and control of the police officers, he was certainly under arrest. Although Officer Farley may have had the right simply to detain and question [Grier] before placing him in custody, he did not do so.

*Id.* at 252, 718 A.2d at 216–217 (internal citations omitted).

Our colleagues on the Court of Special Appeals, in *Dixon v. State,* 133 Md.App. 654, 758 A.2d 1063 (2000), had occasion to consider the issue of whether a suspect had been merely detained under *Terry* or subjected to a *de facto* arrest. In *Dixon,* officers had received a tip that Dixon would be transporting ten pounds of marijuana in a car and would be parking on the second level of a garage at Montgomery Mall at 8:15 PM. When the officers arrived, Dixon's car was already parked, and the officers saw him eventually return and get into the car. The officers then blocked the car in with their cruisers, removed and handcuffed Dixon, whereupon nine gallon-sized bags of marijuana were recovered from the car's trunk.

The Court of Special Appeals held that the event was an arrest when Dixon was taken out of his car and handcuffed, stating:

> As we see it, the events in the garage exceeded an investigatory stop under *Terry* and its progeny. Accordingly, we do not agree with either the State or the trial court that appellant was merely detained prior to the car search. Instead, we conclude that the officers arrested appellant at the time they blocked his car, removed him from his vehicle, and handcuffed him.

*Id.* at 673–74, 758 A.2d at 1073. In so holding, the Court of Special Appeals relied upon our oft-quoted language from *Grier* for the principle that when a suspect is subjected to the custody and control of an officer in such a significant way, he or she is arrested.

■ Application of the principles from *Terry* and in the *de facto* arrest cases leads us, with respect to the circumstances in the present case, to determine that a person shot in the back with two metal darts, as was Reid, would reasonably believe that he or she was not free to leave the encounter, especially when, as the trial judge found, a medical technician would have to have removed the prongs.[8] These circumstances are very similar to those in *Bailey, Grier,* and *Dixon,* in that Reid was subjected to the custody and control of the officer detaining him by the use of physical force. While we recognize that the suspects in *Bailey, Grier,* and *Dixon* were not believed to be armed and that Reid was, such belief does not convert a *de facto* arrest to a *Terry* stop found in *In re David S.* and *Lee,* because the levels of intrusion and control involved in Reid's detention are unquestionably greater than those used to detain either Lee or David S. The use of a Taser in dart mode penetrates the body for an indefinite time period, differentiating it from a "hard take down," the use of handcuffs, and tackling.[9] A reasonable person would not feel free,

---

8. Although not found by the trial court, it appears that not only did the darts puncture the body, but that they apparently remain connected to the Taser device, akin to fastening a leash to the suspect, whereby the officer can maintain complete control over him or her. *See Bryan v. MacPherson,* 630 F.3d 805, 824 (9th Cir.2010) ("The X26 [Taser] uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes into his muscles.... The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." (footnotes omitted)).

9. The State's argument that a Taser used in dart mode is analogous to tackling, and thus permitted as a "hard take down" under *In re David S.,* is not on point because tackling was not the "hard take down"

nor even be able, to go under these circumstances: Reid was, thus, arrested.

We have reviewed hundreds of cases involving the use of force in *Terry* stops, and no appellate court has even considered,[10] much less approved, the use of a Taser in dart mode to effect a *Terry* stop.[11] The only analogous situation to the present one is in the use of a firearm expelling a bullet, which the Supreme Court assumed was an arrest in *Tennessee v.*

---

analyzed in *In re David S.* The State, however, directs our attention to various federal courts that have expressly considered tackling and determined that it can effect a *Terry* stop. In *United States v. Dykes,* 406 F.3d 717 (D.C.Cir.2005), for example, the United States Court of Appeals for the District of Columbia Circuit considered whether chasing after a suspect, who ran away after police pulled into a parking lot in which he was standing, and tackling him to the ground was sufficient to elevate the encounter from a *Terry* stop to an arrest. *Id.* at 718. The Court concluded that tackling was a reasonable method of effectuating the stop, noting that the " 'amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight.' " *Id.* at 721, quoting *United States v. Laing,* 889 F.2d 281, 285 (D.C.Cir.1989). Tackling, however, is not akin to the force at issue.

10. The Court of Appeals for the Third Circuit, in an unpublished opinion, *United States v. Colon,* 434 Fed.Appx. 88 (3rd Cir.2011), affirmed a district court decision, *United States v. Colon,* 654 F.Supp.2d 326 (E.D.Pa.2009), discussed *infra,* involving the use of a Taser to effect a *Terry* stop. The Third Circuit, however, did not address the Taser issue in its unreported affirmance of the trial court.

11. There have been reported cases from various federal circuit courts that have considered, in the context of claims brought under 42 U.S.C. Section 1983, whether the use of a Taser in dart mode was reasonable, but only in the context of an arrest, not a *Terry* stop. *Compare Mattos v. Agarano,* 661 F.3d 433 (9th Cir.2011) (holding that the use of a Taser in dart mode was not reasonable to arrest a woman for interfering with the arrest of her husband when she made only minimal contact with the officer) *and Bryan v. MacPherson,* 630 F.3d 805 (9th Cir.2010) (holding that the use of a Taser in dart mode was not reasonable to effect an arrest of a man who got out of his car wearing only his underpants and was screaming gibberish because he did not pose a threat to the officer) *with Draper v. Reynolds,* 369 F.3d 1270 (11th Cir.2004) (holding that the use of a Taser in dart mode to arrest a truck driver who was becoming increasingly agitated and refusing to obey lawful commands was reasonable) *and Russo v. Cincinnati,* 953 F.2d 1036 (6th Cir.1992) (holding that the use of a Taser in dart mode to arrest a man holding two knives and threatening officers was reasonable).

*Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1, 7 (1985).

The State, however, points to two federal district court cases in which the use of Tasers was considered, *United States v. Colon,* 654 F.Supp.2d 326 (E.D.Pa.2009) and *United States v. Russ,* 772 F.Supp.2d 880 (N.D.Ohio 2011). In *Colon,* officers saw Colon walking down the street in a "high-crime" area late at night. They followed him in their car, eventually pulling up and asking him where he was going, because of their concern that he might have been carrying a firearm in his waistband. They also noticed that he was very nervous and was continually looking over his shoulder, such that he almost ran into a wall. When the officers got out of their car to speak with him, Colon fled. During the subsequent chase, Colon reached into his waistband, where the officers believed he was carrying a gun, and an officer eventually used his Taser to shoot Colon with metal darts.

In ruling on a motion to suppress a gun eventually found on Colon, the district judge analogized the use of a Taser in dart mode to tackling and did not consider the affront to bodily integrity that two prongs in the back effected. We disagree; the use of a Taser in dart mode is not analogous to tackling, because the darts penetrate the skin of an individual, and the individual must wait for medical personnel to remove them.

In *Russ,* officers were responding to a report of a brawl at a bar in Ohio, where they saw Russ leaving the scene. Russ appeared very startled and adopted a fighting stance, when the officers approached. Thereafter, Russ swung at an officer and then took off running. When they took chase, the officers, fearful that a shiny object in his waistband was a gun, fired darts at Russ from a Taser, which did not stop Russ from running.

The trial judge determined that the officers had reasonable, articulable suspicion to effect a *Terry* stop, and "the Officers were entitled to act for their own protection, and for the protection of others in the area, and attempted to do so by

deploying a taser." *Russ,* 772 F.Supp.2d at 891. Obviously, the fact that the darts fired from the Taser did not immobilize Russ differentiates that case from the instant case. Further, Russ never raised the arrest issue when he questioned the Taser attempt. As a result, we do not find succor in the *Russ* case.

In the present case, the trial judge determined that Reid was in custody at the time he was struck in the back by the metal darts fired from the Detective's Taser—a determination with which we agree. The judge's statement that "a reasonable person would believe that [he or she was] in custody and not free to go" after having been struck in the back with metal darts from a Taser is unquestionably correct. No one who is subjected to the ongoing application of force as is caused by having metal projectiles lodge themselves in one's flesh would feel free to go about his or her business. Moreover, Reid *wasn't* free to go after having been shot by the darts because he had to wait for a medical technician to remove them. Reid unquestionably was subjected to the complete control of the police, so that he was subjected to a *de facto* arrest when the darts penetrated his body and not a *Terry* stop. As soon as the darts penetrated Reid's body, a *de facto* arrest occurred for which probable cause must have existed.

To explore this issue, we are required to review the record developed at the suppression hearing. *See Bailey,* 412 Md. at 374–376, 987 A.2d at 87–88 (proceeding to determine whether probable cause existed, after holding that Bailey's detention was a *de facto* arrest and not a *Terry* stop). We have stated that we look at the totality of the circumstances, in reviewing the record to see whether there existed probable cause at the time of arrest, to determine whether "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Longshore v. State,* 399 Md. 486, 501, 924 A.2d 1129, 1137 (2007) (altera-

tions in original).[12]

 The findings in this case upon which a determination of whether probable cause would have existed at the time Reid was arrested are:

- Reid matched a description given by an informant of "a taller individual . . . associated with a black Honda in a particular location," and the informant was calling about "drugs, someone associated with drugs and/or guns and in the vehicle";
- Reid turned his body away from one officer and attempted to open the passenger door of the car when the officers approached the car;
- Reid "check[ed] the area where the gun would be";
- Reid had something heavy in his pocket that caused it to sway; and
- Reid ran from the police.

These facts are not sufficient to establish probable cause under our jurisprudence. More particularly, in *Bost v. State*, 406 Md. 341, 958 A.2d 356 (2008), when confronted with similar facts, we found them sufficient to satisfy the reasonable suspicion standard, short of probable cause. We considered whether District of Columbia police officers had reasonable suspicion to justify crossing into Maryland in hot pursuit of a suspect and effecting his arrest under the Uniform Act on Fresh Pursuit.[13] The suspect in *Bost* was in an area known

---

**12.** Generally, it is difficult to wrest probable cause from a record developed in the trial court to countenance a *Terry* stop; when we have been able to do so, it has been when there had been evidence presented at the suppression hearing of a direct relationship between the crime and what the police witnessed. *See Elliott v. State*, 417 Md. 413, 10 A.3d 761 (2010) (holding that probable cause existed based on the smell of marijuana when officers approached a car); *Donaldson v. State*, 416 Md. 467, 7 A.3d 84 (2010) (holding that probable cause existed based on experienced narcotics officers witnessing a sales transaction of vials of an unknown substance in an area known for drug sales).

**13.** The Uniform Act on Fresh Pursuit is contained in Sections 2–304 to 2–309 of the Criminal Procedure Article, Maryland Code (2001, 2008 Repl.Vol.)

for drug trafficking, fled at the approach of police officers, and clutched his side in such a way as to indicate he could be carrying a gun. We held that presence in a high crime area, unprovoked flight, and furtive movements consistent with possessing a gun were, in the aggregate, sufficient to establish reasonable, articulable suspicion, short of probable cause. *Id.* at 359–360, 958 A.2d at 367.

In the present case, the only additional fact is the existence of the informant's tip, which the trial judge described as not "particularly significant," because the tip itself was not specific enough and was not based on special knowledge sufficient to foretell the future. *See in this regard Lee v. State*, 311 Md. at 654–657, 537 A.2d at 240–242 (holding, based on police corroborating an informant's tip that did not foretell and future activity on the part of the defendants, "the police had a relatively high degree of reasonable and articulable suspicion . . . [b]ut, at that time, the suspicion did not reach a level of *'probability . . . of criminal activity.'* " quoting *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527, 546).

The judge had to have determined that there was probable cause, however, because his application of the public safety exception articulated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), requires a lawful arrest for the exception to be utilized to "save" a statement that had not been *Mirandized.* In *Quarles*, the Supreme Court held that an arrestee need not be given *Miranda* warnings before being questioned if the officers' questions were directed at eliminating a threat to the public's, or their own, safety, after the individual had been lawfully arrested.

The Court of Appeals for the Ninth Circuit succinctly explained the application of the *Quarles* public safety exception in *United States v. Patzer*, 277 F.3d 1080, 1085 (9th Cir.2002). In *Patzer*, an officer pulled over Patzer while he was driving for having a broken taillight. Upon approaching the vehicle, the officer noticed guns on the back seat and that Patzer's eyes were glassy. Suspecting that Patzer had been

smoking marijuana, the officer ordered him out of the car and gave him a series of field sobriety tests, one of which Patzer failed. The officer then asked him to be honest, and Patzer responded that he had been smoking marijuana earlier.

Thereafter, the officer placed Patzer under arrest for driving under the influence and, without giving him *Miranda* warnings, asked Patzer if he was hiding anything illegal in the truck. Patzer admitted that there were illegal guns and grenades in the back of the truck, and the officer seized a sawed-off shotgun, a modified rifle, and grenades. Patzer unsuccessfully moved to suppress the evidence obtained from his truck and was subsequently convicted of a host of weapons and drug charges.

In reviewing the denial of Patzer's motion to suppress his statements, the Ninth Circuit first held that Patzer's arrest for driving under the influence was not lawful under the applicable motor vehicle code. The Court then considered whether the un-*Mirandized* statements made by Patzer were properly admitted under the public safety exception. The Court noted that the public safety doctrine exists for exigent circumstances in which a valid arrest has been made and in which an officer has a reasonable belief that there is a threat to public safety precipitating questions of the arrestee out of safety concerns. Patzer had not been lawfully arrested, and the Ninth Circuit then concluded that Patzer's statements could not be admitted under the public safety exception because, that "questions posed under exigent circumstances might not be *separate* Fifth Amendment violations does not mean that there is a break in the chain of events from the original Fourth Amendment violation." *Id.* at 1085. In so holding, the Court stated, "[j]ust as reading *Miranda* warnings to a suspect after an unlawful arrest does not automatically act as a 'cure-all' and remove the Fourth Amendment taint from subsequently obtained statements, neither does the existence of an exception to the *Miranda* rule" remove the Fourth Amendment taint. *Id.*

In the present case, Reid was arrested without probable cause, so the *Quarles* public safety exception is not applicable. To do otherwise would be to eviscerate the requirement of a lawful arrest.

The State asserts, however, that even if Reid's statement were inadmissible because of the *Miranda* violation, the gun that was recovered is admissible, relying on *United States v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion), for the principle that tangible, derivative evidence recovered as a result of a *Miranda* violation can be admitted into evidence at trial, as long as the statement leading to the discovery of the tangible evidence was not actually coerced. *See id.* at 644, 124 S.Ct. at 2630, 159 L.Ed.2d at 679 ("[I]t is true that the Court requires the exclusion of the physical fruit of actually coerced statements...."). This argument misses the mark for the same reason that *Quarles* is inapplicable in the present case; Reid was not lawfully arrested.

Were we to permit the admission of the gun, what would be the imperative for law enforcement to adhere to Fourth Amendment arrest strictures? The United States Court of Appeals for the Eighth Circuit, in *United States v. Villa–Gonzalez*, 623 F.3d 526 (8th Cir.2010), considered this question when addressing an argument very similar to the State's argument in the present case. In holding that the principle announced in *Patane* could not be used to prevent the suppression of physical evidence discovered as a result of an un-*Mirandized* statement following an unlawful seizure, the court stated, "[w]e find *Patane* inapplicable here. Rather, we are guided by *Wong Sun v. United States* [371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ] .... Here, like in *Wong Sun*, the initial constitutional violation was a Fourth Amendment violation." *Id.* at 535 (internal citations omitted). We agree; Reid was arrested without probable cause, so that the *Patane* principle does not apply.

The State further argues that the admission of the statement was harmless error, because the gun itself was properly

admitted under the doctrine of inevitable discovery. The doctrine of inevitable discovery is not applicable on the facts of this case, however, so we do not reach the harmless error argument.

In arguing inevitable discovery, the State relies on *Elliott v. State,* 417 Md. 413, 10 A.3d 761 (2010), in which we opined that the doctrine of inevitable discovery "is used to overcome the presumed suppression of evidence gained from an unlawful search. The State must show, by a preponderance of the evidence, that the evidence inevitably *would* have been discovered through lawful means." *Id.* at 436, 10 A.3d at 774. In the present case, the trial judge made no finding regarding whether the gun taken from Reid would have been found inevitably, although the State did briefly argue inevitable discovery at the hearing on the Motion to Suppress, saying only that "[w]hen he is stopped, he asked, well he's asked is there any weapon on you but they are going to frisk him, obviously, they believed he had a weapon."

Were we to rely on our own fact-finding in this record, however, we would be running afoul of our own jurisprudence, especially that which was articulated recently in *Elliott v. State,* 417 Md. 413, 10 A.3d 761 (2010), in which we considered whether it was proper for the Court of Special Appeals to address the issue of inevitable discovery *sua sponte.* Officers in that case received a tip from a reliable informant that a man named Winston would be arriving at a shopping center in a black Nissan, inside of which would be a large quantity of marijuana. Elliott parked his car, which matched the informant's description, at the shopping center. After he got out and began walking towards the stores, he was surrounded by SWAT officers with assault weapons who ordered him to the ground. After searching Elliott and his companion and recovering the keys to the car, a Drug Enforcement agent went to the car, detected the odor of marijuana, and opened the trunk, which smelled more strongly of marijuana. He closed the trunk and waited for a K–9 unit to arrive. The dog alerted to the trunk of the car, at which point the officers took Elliott and his companion to the police station. The car was searched

at the station and police found twenty pounds of marijuana in suitcases in the trunk. Prior to trial, Elliott unsuccessfully sought to have the marijuana suppressed.

After he was convicted, Elliott appealed the denial of his motion to suppress, arguing that he had been arrested without probable cause when he was ordered to the ground, and any evidence seized thereafter should have been suppressed. The Court of Special Appeals agreed that he had been arrested at that time, but held that the motion to suppress the evidence was properly denied because of the doctrine of inevitable discovery, which the court raised *sua sponte*. We granted Elliott's Petition for Certiorari, as well as the State's conditional cross-petition, to consider, inter alia, whether it was proper for the Court of Special Appeals to have upheld the denial of the motion to suppress under the inevitable discovery doctrine. We held that it was not proper, under the facts of the case, for the Court of Special Appeals to have raised the issue *sua sponte*, because the record from the suppression hearing did not contain any evidence showing what would have happened were the illegal act not to have occurred. In so holding, we relied on *Stokes v. State*, 289 Md. 155, 423 A.2d 552 (1980), in which we held that the inevitable discovery exception to the exclusionary rule did not apply because the State "could not meet the burden of proving the exception because no evidence was produced at the suppression hearing to support the exception." *Elliott*, 417 Md. at 438, 10 A.3d at 776.

■ The State, in this case, asserts in its brief that, "[t]he record leaves little doubt that the police would have discovered the gun without Appellant's improper statement." The record is devoid of any evidence of police procedure or the course of action the Detective would have pursued had the unlawful arrest not occurred; the judge failed to make related findings. To account for the lack of such direct evidence, the State argues that because the Detective was investigating Reid for possession of a gun, "it is beyond question that Detective Reid would have frisked Appellant's shorts and

discovered the gun." We stated in *Stokes*, however, that "[i]t is true that the State avows in this Court that the police, absent Stokes' statement, 'would' have searched the ceiling above petitioner's bedroom. This unsupported assertion, however, is no substitute for evidentiary proof." *Stokes*, 289 Md. at 165, 423 A.2d at 557–58. Keeping in mind the principle that "speculation will not satisfy the demands of the inevitable discovery doctrine," *Elliott*, 417 Md. at 437, 10 A.3d at 774, quoting *Williams v. State*, 372 Md. 386, 416, 813 A.2d 231, 249 (2002), the State's argument must fail because of our unwillingness to do appellate fact finding on a record devoid of evidence of what *would* have occurred rather than what *could* have occurred.

Because the statement Reid made and the gun that was recovered from his person were the products of an unlawful arrest, and none of the exceptions upon which the State relies apply, we conclude that Reid's Motion to Suppress should have been granted.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

HARRELL, BARBERA, and McDONALD, JJ., dissent.

HARRELL, J., dissenting, in which BARBERA and McDONALD, JJ., join.

With respect, I dissent. Detective Reid's use of a taser [1,2]

---

**1.** The word "TASER®" (in all capital letters) often refers to the largest manufacturer of electronic control devices or "ECDs" (also known as "CEDs," conductive energy devices). The word "taser" is also the colloquial term for all ECDs on the market today, regardless of the manufacturer. I shall use taser or ECD as the generic noun for these devices and shall use tase/tasing/tased as the appropriate tenses of verbs describing the action of deploying a taser on a human subject.

The taser is often grouped with those weapons deemed "less-than-lethal." This term of art is used interchangeably in academic journals with "non-lethal" and "less-lethal." Often these terms refer to police

to effectuate a *Terry*[3] stop and restrain Petitioner, David Reid ("Reid") (no relation), was reasonable, given the circumstances of this case. Therefore, I would affirm the judgment of the Circuit Court for Baltimore City on the grounds that the police officer had reasonable suspicion to effectuate a *Terry* stop and the use of the taser was a reasonable use of force, which did not escalate the encounter to a *de facto* arrest requiring probable cause.

## I. *What is Reasonable Force in a Terry Stop Context?*

### A. *Various Courts and Their Various Interpretations of Reasonable Force*

As a formal detention, a *Terry* stop implicates a person's Fourth Amendment rights against "unreasonable searches and seizures." *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, 899 (1968). Courts and scholars across the land approve varying levels of force in order for a police officer to maintain his or her own safety and the safety of the public-at-large when conducting an investigatory, or *Terry*, stop. The Supreme Court defines the reasonable force that does not convert a *Terry* stop into a *de facto* arrest as that force which is "reasonably necessary to protect [the police officer's or officers'] personal safety and to maintain the status quo during

---

methods, such as flexible batons, bean-bag shotguns, tasers, pepper spray, canines, four-point restraints (hog-tie), and the baton (also known as a nightstick) that fall short of the use of a firearm.

**2.** Jack Cover, a NASA scientist, coined the term taser, which stands for Thomas A. Swift Electric Rifle, a reference to Cover's favorite childhood science-fiction character. Sebastian N. Kunz et al., *Functioning and Effectiveness of Electronic Control Devices Such as the TASER® M- and X–Series: A Review of the Current Literature*, J. Forensic Sci., 2012, at 1.

**3.** Unless otherwise indicated, all references to a *Terry* stop refer to the United States Supreme Court's explication in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968), in which the Court held that a police officer need only have reasonable suspicion that criminal activity is afoot in order to stop and frisk a person for weapons. The lower level of suspicion is justified by the potential danger to the police officer, as well as to the public-at-large.

the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604, 616 (1985). Additionally, the Supreme Court defines the outer boundary of reasonable force based on the danger that the officer believed himself or herself to be facing at the time the force in question is used. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1, 7 (1985) (holding that when a suspect is believed to be unarmed, the use of deadly force to prevent fleeing is unreasonable).

The Model Code of Pre–Arraignment Procedures is instructive on how much and when force may be used by police during an investigatory stop. The Model Code states, in pertinent part:

> (3) Use of Force. In order to exercise [an investigatory-type stop], a law enforcement officer may use such force, other than deadly force, as is reasonably necessary to stop any person or vehicle or to cause any person to remain in the officer's presence.

Model Code of Pre–Arraignment Procedure § 110.2(3) (1975). The American Law Institute reasoned there that it would be "frustrating and humiliating" to tell an officer he or she has the authority to stop someone, but must stand by while that person ignores an order and flees. Model Code of Pre–Arraignment Procedure § 110.2 cmt. (1975). This sentiment, that unchallenged escape should not be an acceptable outcome, was echoed by Justice Rehnquist when he wrote, "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 616 (1972).

Federal courts enumerate factors and a balancing test by which we should evaluate the use of reasonable force. The Seventh Circuit catalogs five factors (which other courts use frequently) when evaluating the reasonableness of the force employed: the nature of the crime under investigation; the degree of suspicion; the location of the stop; the time of day;

and, the reaction of the suspect to the approach of the police. *United States v. Ocampo,* 890 F.2d 1363, 1369 (7th Cir.1989) (citing, among other cases, *United States v. Serna–Barreto,* 842 F.2d 965, 967 (7th Cir.1988)). The Ninth Circuit described the Fourth Amendment balancing test as weighing " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake' " or " 'balanc[ing] the amount of force applied against the need for that force.' " *Bryan v. MacPherson,* 630 F.3d 805, 823 (9th Cir.2010) (quoting *Garner,* 471 U.S. at 8, 105 S.Ct. at 1699, 85 L.Ed.2d at 7, *and Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir.2003)).

## B. *From Whose Vantage Point is Reasonableness to be Judged?*

As articulated in *Terry,* the level and modality of force chosen by a police officer should not be viewed in the first instance through the Court's eyes; rather, it should be seen through the eyes of a reasonable officer on the scene. 392 U.S. at 22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. A judge must not engage in *post hoc* (some may say *de novo* ) evaluation of the police officer's conduct when determining reasonable use of force because alternative methods may always be imagined. *In re David S.,* 367 Md. 523, 540, 789 A.2d 607, 616–17 (2002) (citing *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985)). When reviewing a case originating in Maryland, the Fourth Circuit noted, " 'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Young v. Prince George's Cnty.,* 355 F.3d 751, 755 (4th Cir.2004) (quoting *Graham v. Connor,* 490 U.S. 386, 386–87, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 455–56 (1989)). On this subject, the U.S. Supreme Court noted:

[W]e stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation "at close range," *Terry,* 392 U.S. at 24 [88 S.Ct. 1868], when the

officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger. . . ." *Id.,* at 28 [88 S.Ct. 1868]. In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid intrusion involved in a *Terry* encounter.

*Michigan v. Long,* 463 U.S. 1032, 1052, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201, 1221–22 (1983) (quoting *Terry,* 392 U.S. at 24, 28, 88 S.Ct. at 1881, 1883, 20 L.Ed.2d at 908, 910).

## C. *Examples of Reasonable Force Used in Effectuating a Terry Stop*

There are several instructive cases involving varying degrees of force, akin to a "hard takedown," that do not result in a *de facto* arrest. The holding that deployment of a taser was reasonable in a *Terry* stop context in *United States v. Colon,* 654 F.Supp.2d 326, 333 (E.D.Pa.2009), *aff'd on other grounds* 434 Fed.Appx. 88, 89 (3rd Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1584, 182 L.Ed.2d 199 (2012), is dismissed, without substantial justification, by the majority opinion in the present case. In *Colon,* police officers were patrolling a known high-crime area. 654 F.Supp.2d at 328. The police observed Colon holding nervously the right side of his pants. *Id.* He walked away from the police, even after being ordered to stop. *Id.* When his path was blocked by a police cruiser, he ran. *Id.* The police officers gave chase and tasered Colon, once to bring him to ground and twice more to prevent him from reaching into his waistband, where, after a frisk for weapons, the officers found a handgun. *Colon,* 654 F.Supp.2d at 330. The district court held that a police officer may use force to effect a *Terry* stop, and use of a taser in dart-mode was considered reasonable, given the circumstances that Colon was armed most likely. *Colon,* 654 F.Supp.2d at 333; *see also United States v. Fields,* 449 Fed.Appx. 146, 148–49 (3rd Cir.2011) (holding, in an unpublished opinion, that the use of a taser did not elevate an investigatory *Terry* stop to an arrest,

because the defendant's flight and lack of cooperation made the officers feel vulnerable and fear for their safety).

Several jurisdictions hold that even significant intrusion on a person's Fourth Amendment rights does not convert necessarily a *Terry* stop into a *de facto* arrest situation. In *United States v. Lawshea*, a law enforcement canine was used to subdue a fleeing individual. 461 F.3d 857, 860 (7th Cir.2006). The Seventh Circuit held that this was a reasonable level of force to effectuate a *Terry* stop, given that the individual fled from police and the officer had reasonable suspicion to believe Lawshea may be armed. *Id.* The aftermath of this takedown required hospital treatment of Lawshea for multiple canine bites and administration of a tetanus shot. *Id.* The Seventh Circuit held that Lawshea's own actions, sprinting away from the officer and reaching for his waistband, justified the police officer using the canine to subdue him. *Id.* Given the circumstances, the court held the *Terry* stop was not converted into a *de facto* arrest at the release of the canine. *Id.* Surely, the majority in the present case cannot imagine that Lawshea felt free to leave as the police canine sunk its teeth into his shoulder, penetrating the skin in a more violent and less controlled way than would have taser darts. Nor can it be said that police policy should not dictate that an ambulance be called to treat Lawshea's wounds. The use of a law enforcement canine, as in *Lawshea*, is an extreme example of force effectuating a *Terry* stop. I do not suggest that this Court would find it necessarily an acceptable use of force in all instances. That determination must be made on a case-by-case basis, evaluated from the perspective of the on-scene officer and what he/she confronted. I offer *Lawshea* merely as an example of a more extreme use of force than is present in Reid's case, one that did not result in transforming a *Terry* stop into a *de facto* arrest.

The Fourth Circuit upheld the throwing of an armed suspect on the ground head-first, the jamming of an officer's knee into the suspect's back, and placing the individual in handcuffs, as reasonable force during the effectuation of an investigatory stop. *Young*, 355 F.3d at 756. In *United States v. Dykes*, 406

F.3d 717, 718 (D.C.Cir.2005), the Washington D.C. Metropolitan police used a football-style tackle to effectuate a *Terry* stop, predicated on a reasonable suspicion that Dykes was trafficking drugs. Dykes fled when three police cruisers entered a parking lot where he was conducting an illegal drug transaction. *Id.* Dykes was forced to the ground by one of the officers chasing him. *Id.* The court found this to be an appropriate use of force to effectuate a *Terry* stop in that circumstance. *Dykes,* 406 F.3d at 720. Other courts have concluded similarly to the *Dykes* court. *See, e.g., United States v. Franklin,* 323 F.3d 1298, 1301 (11th Cir.2003) (pulling down a person from a chain-link fence and pinning him on the ground is not a *de facto* arrest requiring probable cause); *United States v. Bonner,* 363 F.3d 213, 218 (3rd Cir.2004) (tackling does not elevate a *Terry* into a *de facto* arrest); *United States v. Jackson,* 175 F.3d 600, 601–02 (8th Cir.1999) (same); *United States v. Weaver,* 8 F.3d 1240, 1244–45 (7th Cir.1993) (four officers tackling a suspect did not cross the bounds of reasonable force in making a permissible *Terry* stop). As will be discussed *supra,* these types of "hard takedowns" are themselves fraught with the potential for injuries to the police officers and fleeing suspects. These injuries could be as, or more, serious than those associated with taser use. The types of injuries, including concussions, broken bones, lacerations, etc., could require medical attention, thereby prolonging the length of what otherwise may have been a brief *Terry* stop, had not the individual bolted or resisted.

### D. *Was Reasonable Force Employed in Reid's Circumstances?*

Detective Reid's use of a taser was a reasonable use of force to effectuate a *Terry* stop in the particular circumstances of his encounter with Petitioner Reid. This Court should not second-guess Detective Reid's actions, as indulged by the majority opinion.

In considering whether a reasonable officer would consider the use of a taser appropriate in the circumstances of this

case, I begin with applying and weighing the factors in *Ocampo:* the nature of the crime, the degree of suspicion, the location and time of day of the stop, and the subject's reaction to approaching police officers. 890 F.2d at 1369. Here, the undisputed facts militate in favor of taser use. The police had an articulable suspicion, generated by an anonymous tip,[4] that a black man (taller than others in a group he was a part of) would be found in the 1400 block of Pennsylvania Avenue, in control of a black Honda, and would possess both drugs and a weapon. The location was a known high-crime area (although the time of day of the encounter was high noon [5]). Moreover, Reid fled when the officers approached on foot. On balance, the *Ocampo* factors suggest strongly that the officers needed to use elevated, yet still reasonable, force to effectuate a *Terry* stop of Reid.

Although there appears a dearth of reported cases involving the use of tasers in effectuating a *Terry* stop, the facts of *Colon* are strikingly similar to those of the present case. Reid, suspected of being armed, was asked to stop by the officer, but ran off with a perceptually heavy item swinging in a pocket of his shorts (remember the anonymous tip?). The officers observed three of the four reasonable suspicion factors, set out in *Illinois v. Wardlow*, 528 U.S. 119, 123–25, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570, 575–77 (2000), to conduct a *Terry* stop: Reid was in a known high-crime area; upon seeing the officers, Reid began to act in a way that indicated to the officers, in their experience, that he was concealing a

---

**4.** There is some debate regarding the reliability of this anonymous tip. The original recipient of the tip, Detective Reid's supervising lieutenant, was not at trial to testify. The veracity of the tip becomes less of an issue, however, after the officers in the field confirmed, through observation, the facts given by the tipster, before attempting to make contact with Reid. Furthermore, Reid's deliberate flight from police may be considered when determining reasonable suspicion to engage in a *Terry* stop.

**5.** If only Marshal Will Kane (Gary Cooper's character in *High Noon* ) had possessed a taser, perhaps some of the bloodshed may have been avoided in that 1952 movie. *High Noon* (Stanley Kramer Productions 1952).

weapon—"blading" his body to the approaching officers and performing weapon security checks by patting his shorts' pocket; and, Reid went into headlong flight as clearly identifiable officers got closer. The use of the taser was reasonable in *Colon* and should be held reasonable here, as Detective Reid needed to act decisively and swiftly in order to effectuate the *Terry* stop of a person the officers had reasonable suspicion to believe may be armed. *See Colon,* 654 F.Supp.2d at 333.

While *Colon* is the most on-point case to the one before us,[6] the levels of other forms of force deemed reasonable by various courts when effectuating a *Terry* stop are instructive by analogy. Before comparing the effect of a taser to the effects of a canine bite or "hard-tackle," we need to recount certain background and contextual factual information regarding the general operational characteristics of the kind of taser in question and the injuries it might (and might not) cause in greatest likelihood. Although the four corners of the record in Reid's case are thin in this regard, there is a body of presumably reliable information that provides an understanding from which to make an informed comparison regarding the reasonableness of the force in question.[7, 8]

---

**6.** The State argues that *United States v. Russ,* 772 F.Supp.2d 880, 891 (N.D.Ohio 2011) is on-point with the present case. We agree, however, with the majority opinion that it is unpersuasive. The Ohio district court did not demonstrate clearly in its opinion that it evaluated the use of a taser in a *Terry* stop context.

**7.** This Court has resorted frequently to taking judicial notice of additional facts (not part of a record, strictly speaking, made in the trial court) that are either matters of common knowledge or capable of certain verification. *See Faya v. Almaraz,* 329 Md. 435, 444–45, 620 A.2d 327, 331 (1993) (relying on medical journals and reports to give context to what was known at the time about AIDS and HIV; *see also Armstead v. State,* 342 Md. 38, 49–50, 673 A.2d 221, 226 (1996) (relying on scientific journals as to the forensic use of DNA); *B.N. v. K.K.,* 312 Md. 135, 139–40, 538 A.2d 1175, 1177–78 (1988) (relying on scientific and technical publications to explicate the science of sexually-transmitted diseases); *Pettit v. Erie Ins. Exch.,* 117 Md.App. 212, 228, 699 A.2d 550, 558–59 (1997) (notice taken of definition in Diagnostic Statistical Manual IV). Therefore, in order to place the parties' arguments in proper context and engage in a rational analysis of them, I rely upon

As explained in footnote 8, *supra*, Detective Reid most likely used either a TASER® M–26 or X–26 model in subduing Petitioner Reid. The X–26 is the newer model, smaller than the M–26, and uses a rechargeable battery magazine as its power source, whereas the M–26 relies on two AA batteries. Charlie Mesloh et al., Fla. Gulf Coast Univ. Weapons & Equip. Research Inst., *A Qualitative & Quantitative Analysis of Conducted Energy Devices: TASER X26 vs. Stinger S200*, 13–14 (2008). The X–26 delivers the same shock level as the battery wears down, but the shock from the M–26 diminishes as the battery wanes. *Id.*

A taser operates in two modes: stun (also known as drive-stun) and dart. *Report of the Maryland Attorney General's Task Force on Electronic Weapons*, 2 n. 1 (2009), *available at* http://www.oag.state.md.us/Reports/ECWReport.pdf. Stun mode is used typically in close-quarters because the officer must press the taser directly onto the subject's skin or clothing. *Id.* Dart mode is used when the subject is beyond arms length. *Id.* The darts are two barbed probes, often described as fish-hooks, cable of being propelled up to 35 feet. Sebas-

---

technical and scholarly journals and reports to provide permissible, relevant, and well-established background information about tasers.

**8.** The record in Reid's case does not reveal explicitly the brand or model of taser Detective Reid used in the incident on 22 June 2010. In order for a Maryland police officer to be authorized to carry an ECD, however, he or she must complete both classroom and hands-on training in its proper use. Code of Md. Regs. (COMAR) § 12.04.05.02, 12.04.05.03(B) (2012). The Police Training Commission (hereinafter the "Commission") sets the minimum training standards for all Maryland Police and Correction Officers, including the Baltimore City Police Department. Maryland Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 3–201, § 3–207. COMAR 12.04.05.05 provides that only a Commission-certified instructor may certify another police officer. The Commission offers training on two models of ECDs only, TASER® models X–26 and M–26. *Approved Training–Police*, Training Notes, February 1998–November 2011, *available at* http://www.mdle.net/tnotes.htm (listing the training available to all Maryland police and correction officers at the end of the monthly newsletter). As the only Commission-certified instructors available were M–26 and X–26 instructors, and Detective Reid, a member of the Baltimore City Police Department, was required to be certified by one of those instructors, it is highly likely that Detective Reid used a TASER® X–26 or M–26 to disable Reid.

tian N. Kunz et al., *Functioning and Effectiveness of Electronic Control Devices Such as the TASER®—and X–Series: A Review of the Current Literature,* J. Forensic Sci., Apr. 2012, at 1–2. Compressed nitrogen gas propels the two darts at 180 feet per second. Kunz, *supra,* at 2; A. Bleetman et al., *Implications for UK Emergency Departments: An Overview of Electronic Weaponry,* Emergency Med. J., Mar. 2004, at 136.

The X–26 and M–26 tasers deliver an electrical shock that will result in loss of neuromuscular control, regardless of whether the probes attach to the subject's clothes or skin (penetrating up to one-inch with the largest of barbs). Scott Savage, *After the Zap: Taser Injuries and How to Treat Them,* Correct Care, Summer 2005, at 9, 19, *available at* http://ncchc.org/pubs/CC/archive/19–3.pdf. The darts on either taser model deliver an initial voltage of up to 50,000 volts, ensuring the two probes complete the electrical circuit, and then deliver approximately 5,000 Volts. Barry E. Mangus et al., *Taser and Taser Associated Injuries: A Case Series,* The Am. Surgeon, Sept. 2008, at 862. The 5,000 volts are delivered in a series of electrical pulses at a very low amperage, approximately 0.5–0.3 joules. Savage, *supra,* at 9. Comparatively, the initial amperage of a defibrillator is 200 joules. *Id.* The barbs deliver 15–20 pulses per second into the subject for up to a five-second cycle, which may be repeated by the officer by depressing the trigger again. Kunz, *supra,* at 2. Thus, the voltage is high, but the duration is short.[9] *Id.*

---

**9.** The National Commission on Correction Health Care explained voltage versus amperage.

> An electrical injury can be considered similar to being struck on the foot with a falling stone. When the stone hits you, the amount of injury you receive will largely be mediated by two factors: the size of the rock and height of the fall. *Obviously, a pebble falling from a roof will cause much less injury than a 100–pound boulder falling even a few inches.*
>
> In electrical injuries, the voltage can be viewed as the stone's height and the amperage as its size. Tasers have a high voltage (tall height) but low amperage (small size). Thus, a Taser may fire with 50,000 volts, but it has minimal amperage—like a small pebble that

Although the pain experienced by a person subjected to a taser hit is not as mild as a static-cling shock, it is not, for analytical purposes, deadly force.[10] Code of Maryland Regulations § 12.14.01.01(B)(28) (2012) defines deadly force as "the force that a trained and authorized professional employee uses with the purpose of causing, or which the authorized professional employee knows will create, a substantial risk of death or serious bodily harm." Although certain organizations describe the taser as lethal and the same level of force as firearm, studies show that, absent a person's underlying physical condition predisposing him or her to an unpredictable injurious consequence, a taser is not lethal when used as intended by an officer's training. *See* Kunz, *supra*, at 1; Justin Ready et al., *Shock Value–A Comparative Analysis of News Reports and Official Police Records on TASER Deployments*, Policing, 3 Oct. 2007, at 141, 151, *available at* www.emeraldinsight.com/1363951X.htm; Wendy M. Denham et al., *Injury Patterns Associated with Nonlethal Law Enforcement Techniques*, Topics of Emergency Med., Sept. 2009, at 30, 34; Mangus, *supra*, at 862. The Ninth Circuit labeled a taser as an " 'intermediate or medium, though not insignificant, quantum of force,' " noting also that tasers may often be used to diffuse a situation before more serious or possibly deadly force becomes unavoidable. *Bryan*, 630 F.3d at 811 (quoting, among other cases, *Sanders v. City of Fresno*, 551 F.Supp.2d 1149, 1168 (E.D.Cal.2008)).

One study found that less than one percent of tased suspects experienced serious injuries due to the darts themselves or secondary injuries caused by falling during a tasing. John Laub, Nat'l Inst. of Just., Dep't of Just., *Study of Deaths*

falls from a roof. It stings, but is unlikely to crush your foot the way the boulder would.
Scott Savage, *After the Zap: Taser Injuries and How to Treat Them*, Correct Care, Summer 2005, at 9, 19, *available at* http://ncchc.org/pubs/CC/archive/19–3.pdf.

**10.** Were it otherwise, certainly the police would not demonstrate the use of tasers to trainees by subjecting a volunteer to its application, a technique frequently employed by police trainers.

*Following Electro Muscular Disruption,* 6–7 (2011) (citing Bozeman et al., *Safety and Injury Profile of Conducted Energy Weapons Used by Law Enforcement Officers against Criminal Suspects,* Annals of Emergency Med., 2009, at 480), *available at* https://www.ncjrs.gov/pdffiles1/nij/233432.pdf. In fact, there have been no proven tasing deaths, absent a relative few where an undisclosed underlying condition of the subject or other contributing factors, such as PCP use or the subject having a pre-existing heart condition, were implicated. *See, e.g.,* Denham, *supra,* at 34–35; Mangus, *supra,* at 862; Laub, *supra,* at vii–viii. Therefore, tasing should be considered for *Terry* stop analysis as "other than deadly force." Clearly that was the case here as Reid survived, without any serious health consequences apparently.

With this knowledge of the painful, but rarely enduring, discomfort of a taser strike, an effective comparison may be made between the use of a taser versus several types of other force deemed reasonable by the relevant case law in criminal matters. The officer in *Lawshea,* without the benefit of an advance anonymous tip, observed Lawshea and another person in a high crime area on a routine patrol around midnight. *Lawshea,* 461 F.3d at 859. After the officer exited the patrol car, Lawshea ran away. *Id.* The officer commanded Lawshea twice to stop and then released the canine when he did not stop. *Id.* The canine brought down Lawshea with a bite to the shoulder and was called off promptly by the officer. *Id.* When Lawshea attempted to run again, the canine was released again. *Lawshea,* 461 F.3d at 860. The Seventh Circuit ruled that Lawshea's suspicious behavior at such a late hour, combined with his repeated efforts to flee, served as reasonable suspicion for a *Terry* stop and use of the canine was reasonable, given that Lawshea was likely armed. *Id.*

It seems to me that the bites of a police canine are a more significant intrusion upon a person's Fourth Amendment rights than taser darts, which may be removed relatively painlessly. Canine bites can be deep, penetrating wounds, and often damage the surrounding muscle. Denham, *supra,* at 36. Extensive soft tissue damage, bone injuries, and infec-

tions, often requiring surgical and vascular intervention, are common in dog bites because law enforcement canines are trained to exert typically 500–800 pounds per square inch of pressure [11] when released properly on a suspect. *Id.* Comparing these injuries to the likely injuries of a taser dart used properly lead me easily to conclude that the use of a taser was reasonable here.

The situations in *Young*, 355 F.3d at 756, *Dykes*, 406 F.3d at 718, *Franklin*, 323 F.3d at 1301, *Bonner*, 363 F.3d at 218, *Jackson*, 175 F.3d at 601–02, and *Weaver*, 8 F.3d at 1244–45, demonstrate how a "hard takedown," using what would be assaultive behavior if executed by anyone other than a police officer in the execution of official duties, is a reasonable amount of force if the officer has reasonable suspicion to believe that the fleeing individual may be armed. *Young* presented the Fourth Circuit with a dramatic intrusion on a person's Fourth Amendment Rights because the police officer threw the suspect to the ground headfirst, placed his knee in the suspect's back, and handcuffed him. 355 F.3d at 756. The takedown of Franklin could have posed significant risks of physical harm also as he was pulled to the ground while climbing a chain link fence in an attempt to evade confrontation with the officer; however, the Eleventh Circuit held the police conduct in securing him was reasonable. *Franklin*, 323 F.3d at 1301.[12]

---

**11.** Unlike a trained law enforcement canine, a typical civilian dog's jaw (pit bulls excepted perhaps, *see Tracey v. Solesky*, 427 Md. 627, 50 A.3d 1075 (2012)), exerts only 200–400 pounds of pressure per square inch. Wendy M. Denham et al., *Injury Patterns Associated with Nonlethal Law Enforcement Techniques*, Topics of Emergency Med., Sept. 2009, at 30, 36.

**12.** The Ninth Circuit Court of Appeals expressed that it is not " 'sufficiently clear' " whether a police officer's use of a taser on a suspect constitutes excessive force under 42 U.S.C. § 1983. *Mattos v. Agarano*, 661 F.3d 433, 446 (9th Cir.2011) (quoting *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149, —— (2011)), *cert. denied*, —— U.S. ——, 132 S.Ct. 2682, 183 L.Ed.2d 45 (2012). Whether a particular force is excessive, for purposes of § 1983, is highly circumstantial. *Mattos*, 661 F.3d at 442. The few cases that discuss tasers

Because a wide array of federal circuits establish that several different modalities and degrees of force effectuating a *Terry* stop were reasonable, all of which involve a significant likelihood of injury and a potential intrusion on a citizen's Fourth Amendment rights, this Court should look to them for guidance in settling on a Maryland position. Based on what has been considered reasonable by the federal courts and the situation in the present case, the intrusion on Reid's person was less serious than that of a police canine bite and no more serious than bringing a fleeing suspect to the ground by tackling or man-handling.

## II. *What Has Timing To Do Properly with Evaluating a Purported Terry Stop?*

The majority opinion states that because Reid was detained for an "indefinite time period" waiting for medical personnel to arrive to remove the taser barbs, the *Terry* stop ripened surely into an arrest. *Reid,* 428 Md. at 303–04, 51 A.3d at 605–06. In doing so, the majority opinion fails to consider two important factors. First, when considering the length of a *Terry* stop, the stopwatch stops as soon as either additional reasonable suspicion or probable cause is developed. *Crosby v. State,* 408 Md. 490, 506, 970 A.2d 894, 903 (2009); *accord Lee,* 311 Md. at 652, 537 A.2d at 239–40. Second, Reid's own actions contributed to prolonging the encounter unquestionably. *See Sharpe,* 470 U.S. at 688–89, 105 S.Ct. at 1577, 84 L.Ed.2d at 617 (Marshall, J., concurring)

We held in *Crosby* that a "*Terry* stop may yield probable cause, allowing the investigating officer to elevate the encounter to an arrest or to conduct a more extensive search of the detained individual." 408 Md. at 506, 970 A.2d at 903 (citing *Terry,* 392 U.S. at 10, 88 S.Ct. at 1874, 20 L.Ed.2d at 899). In *Lee,* the police ordered, at gun-point, the defendants to the ground during a proper *Terry* stop because they had a reasonable suspicion that the defendants possessed a handgun. 311

---

and excessive force are factually similar, rendering it difficult to analogize them to a broader context. *Mattos,* 661 F.3d at 446–48.

Md. at 652, 537 A.2d at 239–40. The investigatory stop in *Lee* ripened to an arrest with probable cause as soon as the officers determined a backpack was too heavy to contain only summer-weight clothes (as claimed) and likely concealed a weapon. *Id.* Mere moments elapsed between the defendants being ordered on the ground (the *Terry* stop) and the elevation to an arrest. *Lee,* 311 Md. at 662–63, 537 A.2d at 245.

The functional stopwatch for the present investigatory stop began when the taser barbs attached to Reid. Upon reaching the incapacitated Reid, the officer inquired if he had any illegal objects on his person. Reid stated he had a gun. The officers handcuffed him and recovered the gun in the right pocket of Reid's shorts. As soon as the handgun was found, there is no doubt the officers had probable cause to arrest Reid, similar to the situation in *Lee. Crosby,* 408 Md. at 506, 970 A.2d at 903. Although the record is silent on the exact amount of time that passed between the tasing and the removal of the gun from Reid's pocket, the discovery of the gun was inevitable, under the circumstances, with the impending pat down.

Another factor in assessing the acceptable duration of a *Terry* stop is whether a suspect's actions lengthen the duration of what might have been otherwise a shorter *Terry* stop. A longer duration does not necessarily transform what commences as a *Terry* stop into a *de facto* arrest. *Sharpe,* 470 U.S. at 688–89, 105 S.Ct. at 1577, 84 L.Ed.2d at 617 (Marshall, J., concurring) (while brevity in a *Terry* stop is important, the suspect's own actions extending the stop's length cannot be overlooked). This was a key holding in *Lawshea,* where the defendant's actions, evading police while suspected of being armed, caused the police canine to be utilized, leading to Lawshea being detained further, including for resultant medical attention. 461 F.3d at 860–61.

The majority opinion fixates on the fact that the taser barbs penetrated Reid's skin, which, according to Baltimore City

Police Department policy,[13] may be removed only by a paramedic.[14] The majority opinion argues that this extended the *Terry* stop to an impermissible length. *Reid,* 428 Md. at 303–04, 305–07, 51 A.3d at 605–06, 606–07. The majority does not consider that the need for medical personnel was occasioned by the fact that Reid fled from the officers, requiring them to use reasonable force to detain him. Rather, like the defendant in *Lawshea,* who did not feel free to leave after the law enforcement canine bit him twice, Reid was also not free to leave during the lawful *Terry* stop effectuated by reasonable force necessitated by his conduct. Once the handgun was found, probable cause existed for a warrantless arrest. *Cros-*

---

**13.** The majority opinion seems oblivious to the fact that the use of medical personnel in similar circumstances is a department-by-department decision and without uniformity of outcome. For example, the U.S. Air Force permits police officers to remove the taser barbs themselves, as long as they have not penetrated a vulnerable area of the body. *United States Air Force Security Forces Command, Air Force Use of Force Manual,* 94 (2009). On the other hand, the New York Police Department requires transportation to the hospital for dart removal in all cases. A Government Accountability Office report to the House Subcommittee on National Security reported that many police departments allow police officers to decide who may remove the barbs, and how the barbs are removed, on a case-by-case basis. Gov't Accounting Office, *Taser Weapons–Use of Tasers by Selected Law Enforcement Agencies,* 16 (May 2005), *available at* http://www.gao.gov/new.items/d05454.pdf. As of 2009, of the 24 Maryland law enforcement agencies that use tasers, only two require paramedics and an ambulance be called; six require an ambulance to take the subject to a hospital; and, 12 leave it to the officer's discretion (four did not report their policy). *Report of the Maryland Attorney General's Task Force on Electronic Weapons,* app. C (2009), *available at* http://www.oag.state.md.us/Reports/ECWReport.pdf.

**14.** According to the National Commission on Correctional Care, there are three ways to remove a taser dart that is not lodged in a vulnerable part of the body, e.g., the throat, face, groin, any implants, or the female breasts: 1) remove the dart with a hemostat (a small surgical clip) because the skin is anesthetized due to the stun; 2) use local anesthesia to remove the dart with a hemostat, although often the administration of the anesthesia is more painful than the removal; and 3) use a scalpel to make a small incision, and close the wound with Dermabond®. In the present case, Reid was struck in the back, as evidenced by photographs taken by officers at the scene.

*by,* 408 Md. at 506, 970 A.2d at 903; *see Lawshea,* 461 F.3d at 860–61; *Lee,* 311 Md. at 662–63, 537 A.2d at 245.

Additionally, the majority opinion appears enamored with the argument that because Reid did not feel free to leave the encounter, it became an arrest requiring probable cause. Whether a person feels free to leave the scene of a confrontation with police merely triggers the defendant's Fourth Amendment rights against *"unreasonable* search and seizure." U.S. Const. amend. IV (emphasis added). *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909; *Lee,* 311 Md. at 653–54, 537 A.2d at 241. I am compelled to address this because the majority opinion muddies the analytical waters regarding the two types of detentions described in *Terry*—an investigatory stop requiring reasonable suspicion and an arrest requiring probable cause.

The majority opinion's misconception appears most obvious where it states, "A reasonable person would not feel free, nor even be able, to go under these circumstances: Reid was, thus, arrested." *Reid,* 428 Md. at 302–03, 51 A.3d at 605. This conclusion leaps over entirely the possibility of an investigatory *Terry* stop, in which a person is seized and not free to go, but is not arrested yet. *See Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. Judge Moylan expressed clearly for the Court of Special Appeals this scenario in *Carter v. State,* 143 Md.App. 670, 677, 795 A.2d 790, 794 (2002):

> The appellant solemnly insists that he "was not free to leave." Of course, he wasn't. That's why this was a *Terry*-stop requiring the *Terry* level of Fourth Amendment justification. Had he been free to leave, this would have been a mere accosting and the Fourth Amendment would not have been implicated. Under *Terry,* a stopee's freedom of movement is most definitely restricted under the command of law. If he attempts to leave after being ordered, perhaps at gunpoint, to stop, he may be shot or otherwise forcibly restrained. Such consequences, notwithstanding the appellant's urging to the contrary, do not *ipso facto* transform a *Terry*-stop into an arrest.

Moreover, it cannot be questioned that an individual with multiple shotguns pointed at him by police officers would not feel free to leave the scene, as was the case in *Lee,* 311 Md. at 666–67, 537 A.2d at 247. Therefore, whether Reid felt free to leave is not a turning point in this analysis; rather, whether the taser was a reasonable amount of force is the relevant inquiry.[15]

Finally, we should consider the safety concerns of both police officers and suspects when judging the reasonableness of the use of technology enhancements employed to accomplish more effective policing. A "hard takedown" may morph easily into a hand-to-hand combat situation, which poses heightened physical risk to the suspect as well as the officer. A study funded by the National Institute of Justice, the research arm of the Department of Justice, found that older-generation ECDs caused no major or moderate injuries to suspects or officers. Conversely, using a flashlight, baton, fists, or other forms of bodily force to subdue a suspect caused moderate or major injury in 46 to 80 percent of the cases studied. Geoffrey P. Alpert, *Police Use–of–Force Outcomes:*

---

**15.** The majority opinion unfurls several cases explaining how a suspect who was detained physically was considered under arrest. *Reid v. State,* 428 Md. 289, 300–07, 51 A.3d 597, 603–07 (2012) (citing *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (an officer who lacks probable cause of involvement in a violent crime, removes a person from a house, brings him to police station, and interrogates him is an arrest); *Bailey v. State,* 412 Md. 349, 987 A.2d 72 (2010) (restraining a person in order to frisk without suspicion of weapons is a *de facto* arrest); *Longshore v. State,* 399 Md. 486, 520, 924 A.2d 1129, 1148 (2007) (handcuffing defendant without suspicion that defendant was armed or violent resulted in a *de facto* arrest); *Dixon v. State,* 133 Md.App. 654, 659–60, 758 A.2d 1063, 1066 (2000) (having no indication of weapons, police arrested the defendant by blocking his car, handcuffing him, and placing him in a squad car)). As the majority admits readily, all of these cases involved persons that were not suspected of being armed and therefore differ significantly from the present case. Whether a suspect is believed to be armed weighs heavily on how much force may be considered reasonable when attempting to detain and question the suspect. *See United States v. Ocampo,* 890 F.2d 1363, 1369 (7th Cir.1989) (citing, among other cases, *United States v. Serna–Barreto,* 842 F.2d 965, 967 (7th Cir.1988)); *see also Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1707, 85 L.Ed.2d 1, 10 (1985).

*Injuries and Control,* The Police Chief, Oct. 2010, at 109, *available at* http://ww.nxtbook.com/nxtbooks/naylor/CPIM 1010/# /108. As officers increase the amount of force used, the likelihood of injury to both officer and suspect increases. *Id.* The use of tasers, however, has decreased the amount of injuries to both suspects and officers. Another study funded by the Department of Justice found that the police departments in Orlando, Florida, and Austin, Texas, after supplying tasers to their officers, experienced 50% and 30% reduction in injuries to suspects, respectively, and a 60% and 25% reduction in police officer injuries, respectively. Alpert, *supra,* at 113–14.

Close-quarters combat can end in tragedy. *Reed v. City of Cleveland,* 1:04CV0546, 2006 WL 3861082, at \*5–6, 2006 U.S. Dist. LEXIS 96549, at \*14 (N.D. Ohio 6 Sept. 2006), highlights this. In *Reed,* police officers attempted to make a routine investigatory stop and handcuff the two defendants for the officers' safety during questioning. *Reed,* 2006 WL 3861082, at \*5, 2006 U.S. Dist. LEXIS 96549, at \*13. When one defendant ran, an officer gave chase, tackled the defendant, and a brawl ensued. *Id.* The defendant, according to the officers' testimony, attempted to take the pursuing officer's weapon. *Id.* In the ensuing fight, the officer received a bloody nose and the defendant was shot and killed. *Reed,* 2006 WL 3861082, at \*5–6, 2006 U.S. Dist. LEXIS 96549, at \*14. Speculatively, had the officer in *Reed* used a taser to subdue the fleeing suspect, it is likely he would still be alive, or at least have a better chance of survival, as compared to the likely outcome of a bullet to the heart at point-blank range. This Court should encourage the decrease of the likelihood of death of suspects and officers.

The situation in *Reed* highlights also why the majority opinion's use of *Garner* to equate the use of a taser to the use of a firearm is unpersuasive. A bullet, when fired at the center mass of a suspect, has the substantial risk of death or serious bodily harm, unlike a taser. Furthermore, the situation in *Garner* differs significantly from the present case: the officer in *Garner* surmised that Garner was not armed and

used deadly force nonetheless to subdue him for what amounted to suspicion of having committed a felony. 471 U.S. at 3, 105 S.Ct. at 1697, 85 L.Ed.2d at 5. The Supreme Court declared unconstitutional the Tennessee law because the blanket approval of the use of deadly force to capture a suspect thought to have committed a felony, regardless of whether the suspect was armed, was a violation of the Fourth Amendment's command against unreasonable search and seizures. *Garner*, 471 U.S. at 11, 105 S.Ct. at 1707, 85 L.Ed.2d at 10. As explained *supra*, a taser is not deadly ordinarily when used properly; conversely, a firearm would be considered deadly and therefore subject to the restrictive view enunciated in *Garner*. *Id.*

The consequences of causing police officers to hesitate to use a taser, where justified by the extant circumstances, during a *Terry* stop to incapacitate a fleeing suspect cannot be understated. In the present case, the majority opinion would require Maryland police officers either to use needlessly their martial arts or linebacker skills or stand by as the fleeing suspect eludes into the sunset, even though the officer has reasonable suspicion to believe the suspect is armed and a potential threat to the officer and the public. Suffering an avoidable escape was an option decried by the Supreme Court in *Adams*, 407 U.S. at 145, 92 S.Ct. at 1923, 32 L.Ed.2d at 616.

For the foregoing reasons, I would affirm the Circuit Court's decision not to suppress the weapon found on Reid. The police officer seized the weapon during a lawful *Terry* stop, based on reasonable suspicion, which was effectuated by reasonable force commensurate to the particular situation. I would uphold the denial of Reid's request to suppress the evidence acquired as a result of the use of the taser. The judgment of the Circuit Court for Baltimore City should be affirmed.

Judge BARBERA and Judge McDONALD authorize me to state that they join in the views expressed in this dissenting opinion.